Frank R. ORTON and Robert F. Orton, Trustees of the H. Frank Orton and Gwen R. Orton Trust, Plaintiffs and Appellees,

v.

Rex M. CARTER and Carol M. Carter, Trustees of the Rex M. Carter Family Living Trust, Defendants and Appellants.

No. 970391.

Supreme Court of Utah.

Nov. 10, 1998.

J. Michael Gottfredson, Salt Lake City, for plaintiffs.

J. Bryan Jackson, Cedar City, for defendants.

STEWART, Justice:

Defendants Rex M. Carter and Carol M. Carter, as trustees of the Rex M. Carter Family Trust (the "Carters"), appeal from the trial court's ruling in favor of plaintiffs H. Frank Orton and Robert F. Orton, trustees of the H. Frank Orton and the Gwen R. Orton Trusts (the "Ortons"). The trial court determined the boundary between properties owned by the parties and found that each party owned an easement in a contiguous portion of the other party's property. For the reasons stated below we affirm the trial court's decision.

## I. ORIGINS OF THE DISPUTE

The Carters and the Ortons own adjacent properties along Center Street in Panguitch, Utah. The Carters own the south 156 feet of Lot 3 (the "West Lot"), while the Ortons own the west half of Lot 4, which is directly east of the Carters' property (the "East Lot"). The line running north-south between the two properties is disputed.

Before 1925, when for at least two months both properties were owned by a common person, and then into the 1930s, an old fence running north to south separated the adjoining properties. The original owners of both lots occupied their properties up to that line. Sometime during the 1930s, however, the owners of both lots agreed to tear down a portion of the old fence and establish a common lane between them. Both parties voluntarily gave the use of eight feet of their properties, measured from the old fence line, to create this common lane. The lane was thus approximately sixteen feet wide and ran perpendicular to the southern boundaries of both lots northward for approximately 115 feet. Parallel wooden fences were built on both sides of the lane with gates on either side for access to the respective properties. The northern portion of the old fence was not removed at that time; it remained visible until sometime in 1992 when it was removed by the defendants.

The owners of the East Lot used the common lane until 1940 when the East Lot was sold to the Ortons. Likewise, the Ortons have continued to use the lane since they purchased the lot. Since 1969, Frank Orton has used the lane as the sole access to a garage he built in the northwest corner of the East Lot. The garage opens facing west, toward the Carters' West Lot. The prior owners of the Carters' West Lot used the lane from the 1930s until 1972 when the property was sold to the Carters.

In 1972 when the Carters purchased the West Lot, the wooden fence marking the eastern boundary of the common lane still existed, running south from the northwest corner of the Ortons' garage to the street. This fence was later replaced by a short chain link fence. The wooden fence that marked the western boundary of the common lane in the Carters' West Lot was no longer standing. The Carters were nevertheless aware that Frank Orton was using a portion of the West Lot for access to the garage.

After purchasing the West Lot, the Carters constructed an office building to be used by the United States Forest Service and paved the surrounding property to create a

parking lot for employees and visitors. The entire area of the common lane was also paved up to the eastern boundary fence. In 1992 and after, the Ortons approached the Carters to assure continued access to their garage. Rex Carter asked John Riggs, son of the West Lot's former owner, where the eastern boundary of his property was located. John Riggs showed Carter the remaining portion of the old fence in the north end of the Carters' property that marked the purported boundary between the two properties. John Riggs also informed Carter of the common lane and that each of the prior owners had contributed one-half the land for creation of the lane. Sometime thereafter the Carters hired a surveyor to determine the boundary between their property and the Ortons' according to the publicly recorded descriptions. The Carters then removed what remained of the old fence line and erected a new chain link fence running about ten feet east of the former location.

The Ortons complained to the Carters about the placement of the new fence north of their garage and asserted an easement across the eastern edge of the Carters' property. No mention of an easement appeared in either the Carters' title or the public record. The Ortons commenced this legal action to establish by judicial decree the easements necessary for their use of the lane and to establish the legal boundary between the two properties.

At trial the Carters contended that the proper boundary between the properties was the eastern side of the historic common lane, now marked by the short chain link fence running from the Ortons' garage south to the street. They also argued that no easement existed since the alleged agreement to create the easement was oral and was never recorded in the public records and because use of the common lane was permissive as among the prior owners and the Ortons. The Ortons, conversely, contended that the boundary is in the middle of the common lane, eight feet west of the short chain link fence, and was marked for decades by the old fence line, the remaining portion of which the Car-

ters had recently removed. The Ortons further argued that the original agreement to create the common lane in fact created a common easement which the Carters were estopped from challenging.

The trial court held that a boundary by acquiescence marked by the old fence line had been created between the two lots by the previous owners of both lots. The trial court also concluded that common easements existed in the location of the historic lane, which both the Carters and the Ortons were entitled to use in perpetuity. The Carters challenge both conclusions on appeal.

## II. BOUNDARY BY ACQUIESCENCE

### A. Standard of Review

"An appellate court 'will not reverse the findings of fact of a trial court sitting without a jury unless they are ... clearly erroneous.'" *State v. Irizarry*, 945 P.2d 676, 678 (Utah 1997) (quoting *inter alia MacKay v. Hardy*, 896 P.2d 626, 629 (Utah 1995)). Generally, we review a trial court's legal conclusions for correctness, according the trial court no particular deference. *See Newspaper Agency Corp. v. Utah State Tax Comm'n*, 938 P.2d 266, 267 (Utah 1997); *State v. Christensen*, 866 P.2d 533, 535 (Utah 1993).

"The finding that an easement exists is a conclusion of law." *Valcarce v. Fitzgerald*, 961 P.2d 305, 311 (Utah 1998). Just recently, however, this Court noted that such a finding is

the type of highly fact-dependent question, with numerous potential fact patterns, which accords the trial judge a broad measure of discretion when applying the correct legal standard to the given set of facts. We therefore overturn the finding of an easement only if we find that the trial judge's decision exceeded the broad discretion granted.

*Id.* (citation omitted). Similarly, in *Richins v. Struhs*, 17 Utah 2d 356, 412 P.2d 314, 315 (1966), we stated that when reviewing a low-

er court's finding of an easement, "we make allowance for the advantages the trial court has because of [his or her] proximity to the parties, the witnesses and the trial." In addition, we have also held that when reviewing a decision creating a boundary by acquiescence, Rule 52(a) of the Utah Rules of Civil Procedure "forbids us from setting aside factual findings unless clearly erroneous, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Judd Family Ltd. Partnership v. Hutchings,* 797 P.2d 1088, 1090 (Utah 1990); *see* Utah R. Civ. P. 52(a) (1998) (defining the effect of findings by the trial court on appeal).

### B. Four Requirements to Establish Boundary by Acquiescence

Four requirements must be met for a court to find a boundary by acquiescence: "(i) occupation up to a visible line marked by monuments, fences, or buildings, (ii) mutual acquiescence in the line as a boundary, (iii) for a long period of time, (iv) by adjoining landowners." *Jacobs v. Hafen,* 917 P.2d 1078, 1080 (Utah 1996). It is undisputed that the properties in question are adjoining; therefore requirement (iv) is met. On this appeal, the Carters contest the first three requirements only, and argue that another requirement should have been considered.

#### 1. The disputed requirements

First, the Carters contend that the first and second requirements are not met because the old fence, which was standing prior to the creation of the common lane, was partially removed when the common lane was created during the 1930s. Hence, they argue, after the creation of the common lane there was no longer a "visible line" marking the boundary between the properties in which the adjoining landowners could acquiesce.

■ While it is true that the old fence line was removed in part to create the common lane, the northern portion of the fence was not removed until 1992 by the Carters. The trial court apparently viewed this northern fence line as sufficiently visible to satisfy the boundary requirement. We agree. Nowhere has this Court stated that a boundary must be a single uninterrupted structure. *See Olsen v. Park Daughters Inv. Co.,* 29 Utah 2d 421, 511 P.2d 145, 147 (1973) (holding that the law merely requires "a recognizable physical boundary *of any character,* which has been acquiesced in as a boundary for a long period of time" (emphasis added)).

It is undisputed that before the Carters purchased the West Lot all prior owners of both lots viewed the old fence line as the boundary between the two lots and that the owners occupied their respective properties to that line. The Carters were specifically informed of that fact. In addition, the common lane itself evidences the prominence of the old fence as the boundary line. The center of the common lane followed exactly the line originally followed by the old fence. Furthermore, for numerous years parallel wooden fences, measured eight feet in each direction from the center line, clearly designated the common lane as an additional boundary marker. *See Baxter v. Utah Dep't of Transp.,* 783 P.2d 1045, 1049 (Utah Ct. App.1989) (finding a line down the center of a river adequate to describe the common boundary between counties), *cert. denied,* 795 P.2d 1138 (Utah 1990).

■ The trial court did not err in finding that the partial fence, together with the well-defined common lane, constituted a sufficiently visible line marking the boundary between the properties. The trial court's conclusion that the respective landowners and their predecessors had acquiesced in the fence line as their properties' boundary is correct.

The Carters' next contention is that the third requirement for boundary by acquiescence was not met. We have previously held that in general a boundary must be maintained for at least twenty years to establish boundary by acquiescence. *See Staker v.*

*Ainsworth,* 785 P.2d 417, 420 (Utah 1990). The Carters argue that because both properties were commonly owned in 1925 and because a portion of the old fence was removed during the 1930s to create the common lane, the fence was not maintained as the property boundary for twenty years.

 Our holding above essentially disposes of this claim. It is true that common ownership of adjoining properties, even for a brief season, restarts the clock for determining boundary by acquiescence. *See Salazar v. Terry,* 911 P.2d 1086, 1089 (Colo.1996) (en banc) (holding that two weeks of joint ownership was sufficient to disrupt the acquiescence time period). Even after 1925, however, the remaining portion of the fence and the well-marked common lane comprised a new visible marker for the same boundary line originally established by the old fence. That marker endured until at least 1972 when the Carters purchased the West Lot. It follows that the trial court did not err in finding the third requirement satisfied.

### 2. The suggested additional requirement

 The Carters argue that a fifth element should have been established for the court to find a boundary by acquiescence. They maintain that in addition to the above four requirements, the court had to find that the boundary was "objectively uncertain," meaning that there had to be no reasonable way to determine the actual legal boundary. They rely on *Halladay v. Cluff,* 685 P.2d 500, 503–05 (Utah 1984), for support.

*Staker* expressly overruled the "objective uncertainty" requirement of *Halladay.* 785 P.2d at 424. We decline to revert to *Halladay* or to depart from *Staker* for the reasons stated therein.

In sum, we affirm the trial court's finding of boundary by acquiescence.

### III. EASEMENTS

The trial court also held that "common easements" existed in both the Carters' and the Ortons' properties that gave each owner the right to use that portion of the other's property covered by the historic common lane. The court did not, however, specify what type of easement had been created. The Ortons argue that the mutual easements that were created were either prescriptive easements or easements by express oral agreement. We address each in turn.

### A. Prescriptive Easement

 A prescriptive easement is created when the party claiming the prescriptive easement can prove that "use of another's land was open, continuous, and adverse under a claim of right for a period of twenty years." *Valcarce,* 961 P.2d at 311; *see also Marchant v. Park City,* 788 P.2d 520, 524 (Utah 1990); *Savage v. Nielsen,* 114 Utah 22, 197 P.2d 117, 122 (1948).

The Carters contest the adverseness element. They assert that the previous owners initially created the common lane by a mutual agreement and that, therefore, the use of the common lane has been permissive from the beginning. In addition, they argue that since 1972 the Ortons have used that part of the common lane that belongs to the Carters with the Carters' express permission that was granted after the Carters paved the common lane to create a parking lot for the Forest Service building. In that context the Carters discussed with Frank Orton his need to have access to his garage, and they extended him permission to continue using their land for that purpose.

 Conversely, the Ortons contend that even though the creation of the common lane was mutually agreed to, the uninterrupted use of the common land predating 1972 is presumed by law to be adverse in this context. They rely on *Richins v. Struhs,* 17 Utah 2d 356, 412 P.2d 314 (1966), which held that "when a claimant has shown that such a use [harmoniously and without conflict] has existed peaceable and without interference for the prescriptive period of 20 years, the law presumes that the use is adverse to the owner; and that it had a legitimate origin."

*Id.* at 315 (citing *Zollinger v. Frank*, 110 Utah 514, 175 P.2d 714, 716 (1946)), *cited with approval in Valcarce*, 961 P.2d at 312. Therefore, the Ortons argue, an easement was created prescriptively well before the Carters purchased the West Lot.

The facts giving rise to the ruling in *Richins* largely mirror those before us. In *Richins*, two adjoining property owners agreed to create a driveway that straddled their common property line. After many years of use, both lots were sold. A new owner commissioned a survey to determine the actual boundary line and erected a fence along that line. Because of the fence the adjacent landowner could no longer access his property. A lawsuit resulted, and this Court held that a prescriptive easement had been created:

> [I]t is our opinion that the reasonable conclusion to be drawn from the facts here shown, where the parties (predecessors) jointly established and used a driveway on what they thought their common boundary, is that the use meets the requirement of being open, notorious, continuous and adverse for more than 20 years and therefore has established a prescriptive right to continue to so use it.

412 P.2d at 316–17.

In *Richins*, the Court referred to the "fundamental principles applicable to prescriptive rights," which arise out of "the general policy of the law of assuring the peace and good order of society by leaving a long established status quo at rest rather than by disturbing it." *Id.* at 315. To further that policy, the Court presumed that the once mutually permissive common driveway should be deemed adverse for purposes of the adverseness requirement. *See id.* This holding is not unusual. *See, e.g., Lee v. Lozier*, 88 Wash.App. 176, 945 P.2d 214, 218 (Wash.Ct.App.1997), (holding that "claimants who were granted permission to use land or who believe that they hold an express easement are not automatically precluded from claiming that they are entitled to a prescriptive easement"; rather, when an oral grant of an easement

has been given and not recorded and the prescriptive period is met, then the oral grant " 'ripens into a prescriptive easement.' " (quoting *Washburn v. Esser*, 9 Wash.App. 169, 511 P.2d 1387, 1390 (Wash. Ct.App.1973))).

In this case, the common lane was created in the 1930s through an amicable agreement between adjoining landowners. Both parties understood that the common lane would straddle what they viewed as their common boundary, with one-half of the lane resting on each owner's property. Both owners, and later the Ortons, used the common lane for several decades. Accordingly, as *Richins* instructs, we conclude that the use of the common lane must be deemed to have been adverse. Thus, if the trial court's finding of an easement meant a prescriptive easement, the trial court correctly ruled.

### B. Express Easement

■ Generally, an agreement to transfer an interest in land falls within the statute of frauds. *See Wells v. Marcus*, 25 Utah 2d 242, 480 P.2d 129 (1971); *see also Green v. Stansfield*, 886 P.2d 117 (Utah Ct.App.1994) (holding that transfer of an easement must generally comply with the statute of frauds). In Utah, the statute of frauds requires that no interest in real property shall be created otherwise than by a conveyance in writing signed by the party creating the interest. *See* Utah Code Ann. § 25–5–1 (1995). It is clear, however, that a verbal agreement to transfer an interest in land can be taken out of the statute of frauds, and that one can be estopped from challenging the oral agreement if three requirements are met: A court must find (1) that there was such an agreement, (2) that there had been part or full performance, and (3) that there was reliance thereon. *See Wells*, 480 P.2d at 130.

■ Here the evidence supports the conclusion that an agreement to create mutual easements was entered into in this case. Jay Riggs and John Riggs both testified that their fathers, the previous owners of the

**1260**

adjacent lots, agreed to make a common lane which would be used in perpetuity. There is evidence that the agreement was sufficiently specific, i.e., that the lane was to be 16 feet wide, eight feet on either side of the property line, and would run from Center Street to what is now about 15 feet north of the northwest corner of the Orton garage, and that use of the lane by both proprietors would be permanent. Finally, under the agreement, each owner gave to the other the use of approximately eight feet of his property as consideration for the bargain to create the easements.

The conclusion that the agreement to create the easements was performed according to its terms is also supported by the evidence. Both parties to the agreement used the lane from the time of its creation. Each party erected a short wooden fence on his side of the lane with a gate opening to his property. The Ortons have used the lane continuously from the time they purchased the East Lot in 1940, and in 1969 they built a garage facing the lane in the northwest corner of the East Lot in reliance on the fact that they would have to access the garage by the common lane without restriction.

This evidence of the verbal agreement to create the common easements and of the agreement's performance even before the Carters acquired the West Lot constitutes sufficient evidence to remove the oral agreement from the statute of frauds. It follows that the trial court's finding of an easement could have been proper based on an agreement to create express easements that was relied on.

It is well established that an appellate court may affirm a "judgment, order, or decree appealed from if it is sustainable on any legal ground or theory apparent on the record," even though that ground or theory was not identified by the lower court as the basis of its ruling. *Limb v. Federated Milk Producers Ass'n,* 23 Utah 2d 222, 225 n. 2, 461 P.2d 290, 293 n. 2 (1969). Although the trial court did not make clear whether its finding of an easement was based on a prescriptive or express easements theory, either ruling would be valid.

The judgment of the trial court is affirmed.

Chief Justice HOWE, Associate Chief Justice DURHAM, Justice ZIMMERMAN, and Justice RUSSON concur in Justice STEWART's opinion.