2004 UT 60

RHN CORPORATION, a Utah corporation, Plaintiff and Appellant,

v.

J. Alton VEIBELL and Willow Creek Water Company, C.C., a Utah limited liability company, Defendants and Appellees.

J. Alton Veibell and Grethe Veibell, Third-party Plaintiffs, Appellants, and Cross–Appellees,

v.

RHN Corporation, a Utah corporation; Leola J. Ericksen Family Limited Partnership, Clarence Richards, Lodees Richards, Charlotte Nelson, Terri Howard, and Gerald Howard, Third-party Defendants, Appellees, and Cross–Appellants.

No. 20010548.

Supreme Court of Utah.

July 16, 2004.

Russell A. Cline, Salt Lake City, for appellants.

Larry S. Jenkins, Salt Lake City, for appellees.

DURHAM, Chief Justice:

## BACKGROUND

¶ 1 This case involves two separate boundary disputes between adjacent landowners in Box Elder County. The Veibell family and the Ericksen family have owned adjacent properties in the county·since the early 1900s. The parties to this case are J. Alton Veibell (Alton Veibell or Veibell), the successor-in-interest to the Veibell property, and the Leola J. Ericksen Family Limited Partnership (the Partnership), the successor-in-interest to the Ericksen property. The parties have raised claims based on boundary by acquiescence and deed reformation.

### I. BOUNDARY BY ACQUIESCENCE CLAIM

¶ 2 The first plot in dispute is a small triangle of land located on the north side of the 111.5 rod mark in Section 23 of Box Elder County.[1] The chain of title ·to this triangle and the surrounding property is as follows: Michael C. Ericksen acquired title to a large parcel of land in Section 23 of Box Elder County in 1901; in 1909, Michael conveyed the property north of the 111.5 rod mark (the Ericksen property) to Joseph Ericksen, who in turn deeded the property to his son and daughter-in-law, Durell and Leola J. Ericksen, on January 19, 1965; Durell Ericksen passed away in 1978, and his wife, Leola, transferred the property to the Partnership in 1987 before she passed away in 1990.

¶ 3 On November 7, 1938, Michael Ericksen conveyed the portion of the property south of the 111.5 rod mark (the Veibell property) to James Weibell,[2] father of Alton Veibell. The 1938 deed contained the following property description:

> Beginning at a point 111.5 rods South of the ·northwest corner· of the Northeast Quarter of Section 23, Township 12 North, range 2 West of the Salt Lake Meridian, running thence South 208.5 rods; thence East 160 rods; thence North 208.5 rods; thence West 160 rods to the place of beginning, containing 108.5 acres.

---

1. See the attached map of the disputed properties.

2. While the son spells the family name with a "V," the father uses a "W."

Alton Veibell obtained legal title to this property in 1958. The four boundaries of the Veibell property are along straight lines with ninety-degree angles. The 111.5 rod mark, running from east to west, is the record boundary separating the Veibell property from the Ericksen property to the north.

¶ 4 Since before 1938, a diagonal fence (the diagonal fence) has run the width of the property along the boundary between the Ericksen and Veibell properties. The west end of the fence begins at a position south of the 111.5 rod mark on the Veibell property. The fence runs northeast, crosses the rod mark about half way down the property line, and continues onto the Ericksen property north of the 111.5 rod mark. For decades, the Ericksens and Veibells treated this fence, not the 111.5 rod mark, as the boundary between their respective properties.

¶ 5 The location of the diagonal fence and the record boundary line create two triangles of land that are in dispute. The Veibells are the record owners of the west triangle, but it is occupied by the Ericksens. The east triangle is owned by the Ericksens, but it is occupied by the Veibells.

¶ 6 The Ericksens have farmed up to the fence since the late 1930s. Durell Ericksen was not alive to testify at trial as to his belief concerning the boundary line. However his brother, Bryce Ericksen, who helped farm the family's land until the early 1960s, testified that he believed that the fence was the true boundary line.

¶ 7 James Weibell, Alton Veibell's father, farmed the Veibell property up to the fence from the 1920s until he passed away in 1951. His son, Alton, continued farming the land up to the fence until the time of trial. Alton Veibell testified that he believed the diagonal fence represented the true boundary line up until 1981, when he had his property surveyed. There is no indication in the record that either family ever objected to the fence as a boundary prior to the 1990s.

¶ 8 While Veibell testified that he did not discover the record boundary was not the fence line until 1981, there is some evidence that as early as 1979, he may have realized that the fence was not the record boundary. In 1979, Veibell sold a lot to his son on the north end of his property that was located precisely on the record boundary, not along the fence line. In 1981, however, Veibell inconsistently deeded a right-of-way across the east triangle, the property he did not own, to Gregory Collings.

¶ 9 In 1999, Alton Veibell filed an action to quiet title in the east triangle.

## II. DEED REFORMATION CLAIM

¶ 10 On April 10, 1967, Alton and Grethe Veibell conveyed by warranty deed (the 1967 deed) a portion of Section 23 south of the fence that ran along the 111.5 rod mark to J. Durell Ericksen and Leola J. Ericksen. The 1967 deed contained the following metes and bounds description of the conveyed property:

Part of the East-half of Section 23, Township 12 North, Range 2 West, SLM, described further as:

Beginning at a point in the N–S centerline of said Section 23, said point being South 2007.8 feet and West 2645.3 feet (South 111.5 rods and West 160 Rods by record) from the NE Corner of said Section 23; thence North 81< 36' E 807.5 feet along an existing fence line; thence S 05< 15' W 1091 feet; thence S 15< 59' E 1089.5 feet; Thence S 07< 07' W 1332.0 feet more or less to the South line of said Section 23, thence West 927.7 feet along said South line of Section 23, to the N–S centerline of said Section 23; thence north 3348 feet (208.5 rods by record) to the point of beginning. Containing in all 75.8 acres, more or less.

¶ 11 The northern boundary of the conveyed property runs along a fence line that slants slightly to the northeast. The eastern boundary contains three slanted legs. The northernmost two legs run alongside Willow Creek, but the southernmost leg veers slightly west of the creek. The southern boundary runs due west along the south line of Section 23. The western boundary runs due north along the N–S centerline of Section 23.

¶ 12 The above metes and bounds description contains two errors that give rise to this dispute. First, the true distance from the southeast corner of the conveyed property to the N–S centerline is approximately 816.75 feet, not 927.7 feet as described in the 1967 deed. Due to this error, the property description does not close, and the southern boundary extends 110 feet onto property not owned by the Veibells at the time of the transfer. Second, the 1967 deed purports to convey "in all 75.8 acres, more or less," but in reality the conveyed property contains only 64.5 acres. Presumably, the error in calculating the acreage resulted from the mistaken call of the southern boundary.

¶ 13 Alton Veibell testified that he and Durell Ericksen negotiated the boundaries prior to the sale of the conveyed property. Regarding the proposed eastern boundary, Veibell testified that he placed four stakes to mark the three slanted legs of the boundary and that these stakes were originally all on the west side of Willow Creek, leaving the creek entirely on Veibell's property. Alton Veibell further testified that he and Durell Ericksen walked the proposed eastern line and that at Ericksen's request they moved the second stake from the north slightly eastward from its original position so that a small portion of Willow Creek lay on Ericksen's side of the boundary. Ericksen desired this accommodation because he wanted access to the water on the north end of the conveyed property. The parties agreed upon this placement of the eastern boundary. Alton Veibell testified that he and Durell Ericksen never discussed a specific number of acres to be conveyed. Rather, he stated, "We were just selling from this point to this point and this point to this point."

¶ 14 After agreeing upon the boundaries, Durell Ericksen hired Erwin Moser, a surveyor, to survey the property. The legal description of the conveyed property was taken from the metes and bounds description on the surveyor's certificate created by Moser. Jeff Hansen, a licensed surveyor, surveyed the property again in connection with this litigation and found a survey pin that Moser had left in the ground in the exact place the eastern and northern record boundaries meet. Hansen testified that the location of the Moser pin indicated that Moser intended the northern boundary to be the length stated in the deed. When Hansen surveyed the property, he accepted the call of the northern boundary and resolved the inconsistency in the property description by shortening the call of the southern border.

¶ 15 Veibell and Ericksen negotiated a purchase price of $175 per acre. Believing the property encompassed by the agreed upon boundaries contained seventy-five acres, they agreed upon a total price of $13,125. The parties executed a real estate contract memorializing the transaction. The contract recited the purchase price and contained the same property description as the 1967 deed, including the erroneous statement that the parcel contained "in all 75.8 acres more or less."

¶ 16 The Ericksens have paid property taxes on 75.8 acres since the 1967 transfer. Joel Henry, an employee of the Box Elder County Recorder's Office, testified that the county taxed the partnership for 75.8 acres in reliance on the acreage description in the 1967 deed.

¶ 17 Within a few years after the 1967 transaction, Alton Veibell hired Paul Palmer to erect a fence following Willow Creek along the length of the east side of the conveyed property. The northern portion of the fence Palmer built runs within several feet of the east record boundary line on the Ericksens' side of the boundary. However, on the south end, the fence and the creek deviate to the east of the record boundary line onto Veibell's land. At the southernmost point, the creek and the fence are over fifty feet east of the record boundary. Palmer testified that he began to build the fence "in the southeast corner of what Mr. Ericksen had bought from Alton," but that at Durell Ericksen's insistence, he eventually moved the fence to its current position at least fifty feet to the east onto Veibell's property. Veibell testified that both he and Durell Ericksen realized that this placement of the southern portion of the fence did not trace the record boundary, but they agreed upon its placement on Veibell's property so that the Ericksens' horses could access the south end of the creek.

Palmer confirmed that he understood the fence was built out of convenience, rather than as a boundary, so that the Ericksens' livestock could water in the creek.

¶ 18 A large, deep gully runs across the southeast end of the property transferred to the Partnership in 1967. If the eastern boundary is located in the position indicated by the 1967 deed, the gully effectively cuts off the Ericksens' ability to access the southeast corner of their property over their own land.

## ANALYSIS

### I. BOUNDARY BY ACQUIESCENCE

¶ 19 The first issue on appeal is whether the trial court properly held that title to the east triangle, which is located north of the record boundary and south of the diagonal fence that the parties have treated as the boundary line, should be quieted to the Veibells under the doctrine of boundary by acquiescence.

¶ 20 At trial, Alton Veibell asserted a claim for the east triangle under the doctrine of boundary by acquiescence. The Partnership made a claim for the west triangle under the same doctrine. The trial court found that "[t]he Veibells and Ericksens treated the fence line as the boundary between their properties for decades prior to the 1967 conveyance." The court inferred from the testimony of Durell Ericksen's brother, Bryce, and from the Ericksen family's occupation of the land north of the fence line that the Ericksens believed that the fence represented the true boundary. The trial court also found that James Weibell and his son Alton Veibell had acknowledged the fence as the boundary line since the 1920s. Having established that there was mutual acquiescence in the fence as a boundary for a long period of time, the court quieted title in the east triangle with the Veibells and in the west triangle with the Partnership.

¶ 21 On appeal, the Partnership argues that the district court's ruling as to the east triangle should be reversed. We disagree.

■ ¶ 22 The Partnership questions the trial court's findings of fact as they relate to the boundary by acquiescence claim. We " 'will not reverse the findings of fact of a trial court sitting without a jury unless they are ... clearly erroneous.' " *Orton v. Carter,* 970 P.2d 1254, 1256 (Utah 1998) (quoting *State v. Irizarry,* 945 P.2d 676, 678 (Utah 1997)). We review the trial court's conclusions of law on this issue "for correctness, according the trial court no particular deference." *Orton,* 970 P.2d at 1256.

■ ¶ 23 "The elements of boundary by acquiescence are (i) occupation up to a visible line marked by monuments, fences, or buildings, (ii) mutual acquiescence in the line as a boundary, (iii) for a long period of time, (iv) by adjoining landowners." *Jacobs v. Hafen,* 917 P.2d 1078, 1080 (Utah 1996). The Partnership concedes satisfaction of the first element in that there was occupation up to a visible line marked by the fence. The fourth element is also met; the parties and their predecessors-in-interest have owned adjacent land on either side of the east triangle for the entire period in question. The Partnership, however, contests the trial court's finding regarding the second and third elements that there was mutual acquiescence in the boundary for a long period of time.

### A. Mutual Acquiescence

■ ¶ 24 "Under the doctrine of boundary by acquiescence, the party attempting to establish a particular line as the boundary between properties must establish that the parties mutually acquiesced in the line as separating the properties." *Ault v. Holden,* 2002 UT 33, ¶ 18, 44 P.3d 781. To acquiesce means to "recognize and treat an observable line, such as a fence, as the boundary dividing the owner's property from the adjacent landowner's property." *Id.* Acquiescence is a "highly fact-dependent question," *see Orton,* 970 P.2d at 1256, and "acquiescence, or recognition, may be tacit and inferred from evidence, i.e., the landowner's actions with respect to a particular line may evidence the landowner impliedly consents, or acquiesces, in that line as the demarcation between the properties." *Ault,* 2002 UT 33 at ¶ 18, 44 P.3d 781.

¶ 25 Courts have looked at various landowner actions as evidence of acquiescence in a visible line as a boundary. Occupation up to, but never over, the line is evidence of acquiescence. *See Staker v. Ainsworth,* 785 P.2d 417, 420–21 (Utah 1990) (weighing the fact that "[o]wners occupied houses, constructed buildings, farmed, irrigated, and raised livestock *only* within their respective fenced areas" (emphasis added)); Richard R. Powell & Michael Allen Rohan, 9 Powell on Real Property § 68.05[6][d] (2004) (noting that " 'cultivating up to, but never over, a line' " is evidence of acquiescence (quoting *Knutson v. Jensen,* 440 N.W.2d 260, 263 (N.D.1989))). However, occupation by itself may in some cases be insufficient to establish acquiescence. *See Hales v. Frakes,* 600 P.2d 556, 559 (Utah 1979) ("[P]laintiff's occupation to the fence without interference was not sufficient to establish defendant's acquiescence in the fence as a boundary."). Acquiescence may also be shown by silence, or the failure of a party to object to a line as a boundary. *See Judd Family Ltd. P'ship v. Hutchings,* 797 P.2d 1088, 1090 (Utah 1990) (weighing the fact that "not once did Judd then suggest or imply that the fence was not in the proper location"); *Staker,* 785 P.2d at 420–21 (weighing the fact that "[t]here [was] no indication in the record that any predecessor in interest behaved in a fashion inconsistent with the belief that the fence line was the boundary" and that "there [was] no indication that any landowner ever notified his neighbor of a disagreement over the true boundary" in finding mutual acquiescence); *Mason v. Loveless,* 2001 UT App 145, ¶ 20, 24 P.3d 997 ("[O]ur settled case law … clearly provides that acquiescence may be established by silence.").

¶ 26 The Partnership contends that the trial court erred in concluding that the Ericksens acknowledged that the fence in the east triangle was the boundary. The Partnership argues that this conclusion is not supported by the evidence because there was no direct evidence that either Durell Ericksen or his father, both of whom are deceased, believed that the fence was the boundary. However, because acquiescence may be inferred from the landowner's actions, the absence of direct evidence of a prior owner's subjective belief concerning the boundary is not fatal to an assertion of mutual acquiescence. *See, e.g., Staker,* 785 P.2d at 420–21 (basing a finding of mutual acquiescence where there was no positive evidence that the parties acknowledged a fence line as a boundary on the fact that "[t]here [was] no indication in the record that any predecessor in interest behaved in a fashion inconsistent with the belief that the fence line was the boundary"). This especially holds true where that owner is deceased and unable to testify.

¶ 27 The Ericksens' recognition of the fence as a boundary can be reasonably inferred from the evidence presented at trial. Durell Ericksen's brother, Bryce, who worked on the farm during the 1960s, testified that he always believed that the fence was the true boundary. The Ericksens' actions over the years also indicate that they have recognized the fence as a boundary. They have farmed up to the fence line since 1938, and they never occupied the land south of the fence. Furthermore, the Ericksens never objected to the fence line as the boundary. In light of these facts, the trial court's inference of the Ericksens' acquiescence is not clearly erroneous.

¶ 28 The Partnership further argues that Alton Veibell did not acquiesce in the fence because the 1958 deed transferring the property from Veibell's father to Veibell placed him on constructive notice of the record boundary. The Partnership relies on *Low v. Bonacci,* 788 P.2d 512 (Utah 1990), in which we held no acquiescence existed where Bonacci was placed on notice of the true boundary by a prior judicial action involving his predecessor-in-interest over the same metes and bounds description and same fence line. In *Low,* we noted that the combination of the prior judicial action and the metes and bounds description contained in the deed transferring the property to Bonacci negated the party's claim to acquiescence. *Id.* at 513. However, *Low* is distinguishable from the present action because in this case there has been no prior judicial action that has already determined the boundaries in question. To allow constructive notice of the true boundary in the conveying deed to ne-

gate acquiescence would unduly restrict the doctrine of boundary by acquiescence by preempting claims whenever parties mutually acquiesce in a visible line that conflicts with a record boundary contained in the conveying instrument.

¶ 29 In fact, the Partnership's constructive notice argument is reminiscent of the objective uncertainty requirement that we eliminated from the boundary by acquiescence cause of action. *Staker v. Ainsworth*, 785 P.2d 417, 424 (Utah 1990). Prior to *Staker*, a party claiming boundary by acquiescence was required to prove a fifth element, namely "that during the period of acquiescence there was some objectively measurable circumstance in the record title or in the reasonably available survey information ... that would have prevented a landowner, as a practical matter, from being reasonably certain about the true location of the boundary." *Halladay v. Cluff*, 685 P.2d 500, 505 (Utah 1984), *overruled by Staker*, 785 P.2d at 424. In other words, under *Halladay*, a claimant could not "assert boundary by acquiescence if he ... had reason to know the true location of the boundary." 685 P.2d at 505. One such "reason to know" would include "information contained in the record title." *Id.* at 513 (Howe, J., dissenting). We eliminated this fifth requirement because it "makes boundary by acquiescence less practical, further restricts what was already a restrictive doctrine, and 'effectively eliminate[s] boundary by acquiescence as a viable doctrine for settling property disputes in Utah.'" *Staker*, 785 P.2d at 423 (quoting *Recent Developments in Utah Law*, 1985 Utah L.Rev. 131, 194). We reject the Partnership's claim that constructive notice of the true boundary via the metes and bounds description in the 1958 deed precludes a showing of acquiescence on the part of Alton Veibell.

### B. For a Long Period of Time

¶ 30 The requirement that mutual acquiescence be for a long period of time has been interpreted in Utah to mean at least twenty years. *Jacobs v. Hafen*, 917 P.2d 1078, 1080 (Utah 1996); *Hobson v. Panguitch Lake Corp.*, 530 P.2d 792, 795 (Utah 1975). The Ericksens and Veibells ac-

quiesced in the diagonal fence as a boundary for a long period of time. The Partnership and its predecessors-in-interest acquiesced in the fence as a boundary beginning in 1938 and continuing up through the time of the trial. The Veibells also acquiesced in the fence as a boundary beginning in 1938 and continuing at least up until either 1979 or 1981 when Alton Veibell discovered the true location of the record boundary. Veibell's occupancy and possession for a long period of time "ripened into a legal title" long before he discovered the actual location of the record boundary. *Brown v. Peterson Dev. Co.*, 622 P.2d 1175, 1177–78 (Utah 1980).

¶ 31 Pointing to the fact that Alton Veibell knew about the true boundary line possibly as early as 1979, the Partnership contends that Veibell "acquiesced in the record boundary for more than 20 years, thus defeating any boundary by acquiescence that may have been established prior." We disagree. Once adjacent landowners have acquiesced in a boundary for a long period of time, the operation of the doctrine of boundary by acquiescence is not vitiated by a subsequent discovery of the true record boundary by one of the parties. *Staker v. Ainsworth* involved a boundary by acquiescence claim in which there was evidence that one of the adjoining landowners, Maxfield, had discovered the location of the true boundary thirteen years before the parties commenced an action to resolve the discrepancy. 785 P.2d 417, 420 (Utah 1990). We explained that Maxfield may not have acquiesced in a fence as a boundary after the time he discovered that the record boundary line did not correspond with the fence line. *Id.* at 420; *see also Wood v. Myrup*, 681 P.2d 1255, 1258 (Utah 1984) (holding "that acquiescence cannot be inferred beyond [the time] when [the] plaintiffs ... received a survey and knew that their legal line was some feet south of the fence"). Nevertheless, because the adjacent landowners had acquiesced in the boundary for a long period of time prior to the time Maxfield discovered the discrepancy, we held that the boundary by acquiescence claim had been successfully established. *See Staker*, 785 P.2d at 421; *see also Brown*, 622 P.2d at 1177–78 ("The title lost by defendants' predecessors

by virtue of the operation of the doctrine of boundary by acquiescence did not revert to the defendants nor to the former owners of the record title when the surveyors established the record title line...."); *Tripp v. Bagley,* 74 Utah 57, 276 P. 912, 916 (1928) ("[W]here the owners of adjoining lands occupy their respective premises up to a certain line which they mutually recognize as the boundary line for a long period of time, they and their grantees may not deny that the boundary line thus recognized is the true one."); *Rydalch v. Anderson,* 37 Utah 99, 107 P. 25, 30 (1910) ("[W]here owners of adjacent parcels of land have occupied, adversely to each other for more than [the required period of time], their respective tracts by a division line, which each has recognized and acquiesced in as the true boundary line, during all of that time, either is estopped from afterwards questioning it as the true line." (quoting *Johnson v. Brown,* 63 Cal. 391, 393, 1883 WL 1478 (1883))). Therefore, because Veibell and his predecessors-in-interest acquiesced in the fence for a long period of time *prior* to his discovery of the true record boundary, the trial court properly found that legal title to the east triangle had vested in the Veibells.

## II. DEED REFORMATION

¶ 32 The next issue on appeal is whether the trial court erred in finding that the parties to the 1967 transaction intended to transfer a particular acreage rather than a specific parcel of land, and in reforming the deed to conform with that intent. The trial court held that the 1967 deed contained a mutual mistake in that it purported to convey 75.8 acres of land but in reality conveyed ten acres less. The court also found that "[t]he parties intended to transfer about seventy-five acres" as evidenced "by the plain language of the warranty deed, the Real Estate Contract, and the Surveyor's Certificate." The trial court further found that "[t]his intent to transfer seventy-five acres [was] also shown by the purchase price."

¶ 33 Regarding the placement of the eastern boundary, the trial court explained:

The Moser description can be made to close in two different ways: (i) by extending the 807.5 foot call from the point of beginning along the then existing (in 1967) fence line, which forms the northern boundary of the parcel, to a distance needed to close the description, or (ii) by shortening the 927.7 [foot] call along the southern boundary of the parcel so that the description closes.

The first method, according to the record, would create a parcel containing approximately 73.028 acres, and the second method would leave the partnership with fewer than sixty-five acres.

¶ 34 Based on its finding that the parties intended to convey seventy-five acres, the trial court reformed the deed according to option (i), which shifted the eastern boundary about 100 feet to the east, extended the south boundary to 927.7 feet, and lengthened the north boundary (the reformed boundary). The trial court explained that "[r]eforming the warranty deed in this way will reflect the intent of the parties" and noted that "[t]his description will come closer to the existing fence ... and is closer to seventy-five acres than the description urged by Veibell."

¶ 35 "Reformation of a deed is a proceeding in equity." *Hottinger v. Jensen,* 684 P.2d 1271, 1273 (Utah 1984). While it is settled that in cases at law, an appellate court will review a trial court's findings of fact under a clearly erroneous standard, *State v. Pena,* 869 P.2d 932, 935 (Utah 1994), in cases in equity, some confusion still exists over the proper standard of review for a trial court's findings of fact. In equity cases, appellate courts have often applied a clear preponderance standard. *See Spears v. Warr,* 2002 UT 24, ¶ 23, 44 P.3d 742; *Horton v. Horton,* 695 P.2d 102, 105 (Utah 1984); *Jensen v. Brown,* 639 P.2d 150, 151–52 (Utah 1981); *Del Porto v. Nicolo,* 27 Utah 2d 286, 495 P.2d 811, 812 (1972). Nevertheless, there is also a recent trend in equity cases to review findings of fact under the clearly erroneous standard. *See, e.g., MacKay v. Hardy,* 896 P.2d 626, 629 (Utah 1995); *Bellon v. Malnar,* 808 P.2d 1089, 1092 (Utah 1991); *Bountiful v. Riley,* 784 P.2d 1174, 1175 (Utah 1989). Truth be told, there is little, if any,

difference between these two standards. *Jensen,* 639 P.2d at 152 ("In substance, [the clear preponderance standard] is the same standard applied in those cases which state that we reverse only when the trial court's finding is against the clear weight of the evidence."). In the interests of simplicity, therefore, we hold that the proper standard of review for a trial court's findings of fact for cases in equity is the same as for cases at law, namely the clearly erroneous standard. Moreover, in both equity and law, we review the trial court's conclusions of law for correctness. *Pena,* 869 P.2d at 936; *Bellon,* 808 P.2d at 1092.

¶ 36 Reformation of a deed is appropriate where the terms of the written instrument are mistaken in that they do not show the true intent of the agreement between the parties. There are two grounds for reformation of such an agreement: mutual mistake of the parties and ignorance or mistake by one party, coupled with fraud by the other party. *Hottinger,* 684 P.2d at 1273.

¶ 37 This case involves a mutual mistake by the parties. "Mutual mistake of fact may be defined as error in reducing the concurring intentions of the parties to writing." *Naisbitt v. Hodges,* 6 Utah 2d 116, 307 P.2d 620, 623 (1957). The metes and bounds description in the 1967 deed fails to close, and it purports to convey "75.8 acres, more or less," whereas the property conveyed contains only 64.5 acres. The trial court and the parties agreed that these discrepancies in the deed constitute a mutual mistake.

¶ 38 Once a mutual mistake has been shown, "the intention of the parties is the controlling consideration" in reforming a deed. *Losee v. Jones,* 120 Utah 385, 235 P.2d 132, 137 (1951) (looking to the intent of the parties to reform a deed in which the metes and bounds description failed to close the property). Reformation "is not available to rewrite a contract to include terms never contemplated by the parties." *Cunningham v. Cunningham,* 690 P.2d 549, 552 (Utah 1984), *overruled on other grounds by State v. Mead,* 2001 UT 58, ¶ 43, 27 P.3d 1115. Extrinsic evidence is admissible to assist in determining the intent of the parties. 66

Am.Jur.2d *Reformation of Instruments* § 114 (2001) ("[I]n suits to reform written instruments on the ground of fraud or mutual mistake, parol and other extrinsic evidence is admissible ... to show how the writing should be corrected in order to conform to the agreement or intention which the parties actually made or had.") (citations omitted); *see Naisbitt,* 307 P.2d at 623–24 (determining the intent of the parties from conversations between adjoining landowners, possession of the property, and the lack of objection to the mistaken boundary).

¶ 39 Before reviewing the trial court's determination of the parties' intent, we must determine whether the principles of deed construction are applicable in a reformation proceeding.

*A. Deed Construction Versus Reformation*

¶ 40 The Partnership contends that in the context of a reformation claim, it is inappropriate to apply the rules of deed construction. We find this argument unpersuasive. Whereas a reformation action is an action in equity, deed construction is a proceeding in law. *Hartman v. Potter,* 596 P.2d 653, 656 (Utah 1979) ("In the absence of ambiguity, the construction of deeds is a question of law for the court...."). In an action to construe a deed, the court will "determine the parties' intent from the plain language of the four corners of the deed." *Ault v. Holden,* 2002 UT 33, ¶ 38, 44 P.3d 781. A court may also look to extrinsic evidence if the deed is ambiguous. 23 Am. Jur.2d *Deeds* § 192 (2001) ("Extrinsic evidence is admissible to illuminate the intent of the parties if the terms of a deed are ambiguous.").

¶ 41 Some property disputes may be resolved through either a construction or a reformation analysis. *See, e.g., Knutson v. Reichel,* 10 Wash.App. 293, 518 P.2d 233, 236 (1973) ("While the trial court considered the problem as one of ambiguity warranting reformation of the deed, and we have viewed it as one of construction, the result is the same."). Nevertheless, it is important to recognize that deed construction is distinct from deed reformation. *Williams v. Oldroyd,* 581 P.2d 561, 563

(Utah 1978) ("Applying rules of construction, however, does not constitute reformation of a deed."); *Doman v. Brogan,* 405 Pa.Super. 254, 592 A.2d 104, 109 n. 6 (1991) ("Deed 'construction' should not be confused with deed 'reformation,' whereby a Court of Equity might rewrite the written word based on clear, precise and indubitable evidence of mutual mistake or fraud."). Recognizing the distinction between the two claims is important because a court of law's ability to construe a deed is more limited than a court of equity's ability to reform a deed. In construction cases, a court is limited to interpreting only the language contained in the deed. *See Park v. Wilkinson,* 21 Utah 279, 60 P. 945, 946 (1900) ("The words used in the deed should be construed so as to ascertain the intention of the parties making it."); *Padilla v. City of Santa Fe,* 107 N.M. 107, 753 P.2d 353, 356 (Ct.App.1988) ("A court may not, in effect, reform a deed when attempting to interpret or construe it."); *Cont'l Oil Co. v. Doornbos,* 402 S.W.2d 879, 882 (Tex.1966) (reversing the trial court's insertion of a term not originally included in a deed because "under guise of seeking a construction of the deed ..., the plaintiffs were actually seeking, and the judgment actually grants, reformation of the deed"). In a reformation proceeding, however, a court of equity has the authority to add new terms to a deed or alter the original language of a deed to conform to the parties' intent. *See, e.g., Hottinger,* 684 P.2d at 1273 (reforming a property description to describe a boundary that was not contained in the original description).

¶ 42 Appealing to this distinction between reformation and construction, the Partnership argues that the rules of construction are inapplicable to a reformation claim. However, while a court may not reform a deed under the guise of deed construction, there is no analogous limitation on applying the rules of construction in a reformation claim. The controlling consideration in a reformation claim is the intent of the parties. *Losee,* 235 P.2d at 137. The rules of construction are time-proven principles and presumptions that courts have developed to assist in extrapolating the intent of the parties from a document. *See Chournos*

*v. D'Agnillo,* 642 P.2d 710, 712 (Utah 1982) ("The paramount rule of construction of deeds is to give effect to the intent of the parties ... as expressed in the deed as a whole."); 23 Am.Jur.2d *Deeds* § 192 ("When, and only when, the meaning of a deed is not clear, or is ambiguous or uncertain, will a court resort to established rules of construction to aid in the ascertainment of the grantor's intention ...." citations omitted). Because the rules of construction assist in ascertaining the intent of the parties, their consideration is relevant and permissible in a reformation claim. *See, e.g., Lentini v. Hager,* 47 Northumb. L.J 200, 73 Pa. D. & C.2d 71 (1975) (applying rules of deed construction in a proceeding in equity to reform a deed). If we were to adopt the rule that the Partnership encourages, we would limit the court's ability to look to and interpret the most valuable piece of evidence of the parties' intent: the conveying instrument itself. Thus, we see no reason why the application of the rules of construction should be prohibited in a reformation claim as the Partnership contends.

### B. Intent to Transfer a Certain Acreage

¶ 43 The first issue that the discrepancies in the 1967 deed raise is whether the parties' primary intent was to convey 75.8 acres or to convey property with specifically defined boundaries. The parties to the 1967 deed either intended to convey 75.8 acres and chose the boundaries accordingly, or they chose the boundaries of the property they intended to convey and calculated the acreage accordingly. The trial court erred in concluding from the evidence that the parties intended to transfer about seventy-five acres, rather than property along specific boundaries.

¶ 44 To determine the parties' intent, we look first to the terms of the 1967 deed. In deed construction, metes and bounds descriptions prevail over acreage. "A statement of quantity ordinarily adds nothing to a particular description except where the grantor has unequivocally expressed an intention to pass only a certain quantity of land." David A. Thomas &

James H. Backman, *Thomas and Backman on Utah Real Property Law* § 13.05(b)(7)(i)(D)(5) (1999). The property description in question defines the boundaries with specificity and contains no unequivocal expression of intent to convey a specific quantity of land. Rather, the placement of the sentence, "Containing in all 75.8 acres, more or less," after the metes and bounds description indicates that the acreage was a calculation of the quantity of land described by the metes and bounds description. The inclusion of the phrase "more or less" bolsters this position. 23 Am.Jur.2d *Deeds* § 251 ("General references to quantity, within the context of more specific descriptions of the property, are not a controlling factor as to the area of land conveyed or ... in a deed. This principle is especially operative where the land is represented to contain a certain number of acres 'more or less.' " (footnotes omitted)). Therefore, the language of the 1967 deed evidences that, while the parties may have *believed* they were conveying 75.8 acres, they primarily *intended* to transfer property along specific boundaries.

¶ 45 Our analysis on this point, however, is not limited exclusively to principles of deed construction. Extrinsic evidence further confirms that the parties' primary intent was to convey property defined by specific boundaries, not to convey a specific acreage.

¶ 46 In finding that the parties intended to convey seventy-five acres, the trial court weighed the fact that the purchase price was calculated on a per acre basis multiplied by 75.8 acres. However, the universal convention in transfers of real property is to base payment on quantity. Thus, it is doubtful that the parties negotiated a purchase of 75.8 acres as opposed to merely calculating the purchase price in reliance on the mistaken property description contained in the deed. The trial court further found that the Ericksens' payment of property taxes on seventy-five acres over the years evidenced intent to convey 75.8 acres. However, the property taxes were also assessed in reliance on the deed's mistaken acreage statement. The purchase price and the payment of taxes, if anything, support the conclusion that the parties believed that property transferred contained 75.8 acres, not that the primary intent of the parties was to transfer 75.8 acres.

¶ 47 Perhaps the best extrinsic evidence of the parties' intent is Alton Veibell's testimony that he and Durell Ericksen negotiated specific boundaries and never discussed a conveyance of a specific number of acres in negotiating the 1967 transaction. In light of this testimony, and the language of the 1967 deed, the trial court's finding that the parties intended a transfer of about 75.8 acres is clearly erroneous. We conclude instead that the parties intended a transfer of property along specific boundaries.

### C. Where the Parties Intended to Place the Eastern Boundary

¶ 48 Having found that the parties negotiated a conveyance along specific boundaries, the second question we must resolve is where the parties intended to place the eastern boundary of the conveyed property. As the trial court noted, the property description in the 1967 deed can be made to close by either (i) extending the northern boundary, which shifts the eastern boundary further east, or (ii) shortening the 927.7 foot call of the southern boundary, which leaves the eastern boundary in the position described by the deed. Undoubtedly, the parties intended the property description to close; however, the language of the deed provides little insight into which option the parties intended.

¶ 49 The trial court chose the first option, noting that it "reflect[ed] the intent of the parties" to transfer about seventy-five acres. The trial court never found, however, that the parties intended the eastern boundary to be located in the position described in the first option. In fact, the preponderance of the evidence indicates that the parties intended the second option.

¶ 50 The Partnership argues that the record boundary effectively renders the southeast corner of the Partnership's property inaccessible from its own property due to a large gully that cuts across that corner. Moving the eastern boundary further to the east would allow the Partnership to access

the southeast corner over its own property. It is reasonable to assume that Durell Ericksen would have negotiated a boundary that allowed him to access all of his property over his own land. This is the sole fact presented at trial that clearly supports the conclusion that the parties intended the boundary to be further east than the record boundary.

¶ 51 In contrast, there is substantial evidence that the parties to the 1967 transaction intended a transfer of property along the record eastern boundary. Alton Veibell, the only remaining living party to the 1967 transaction, testified that he and Durell Ericksen negotiated and mutually agreed upon the placement of the eastern boundary as it is actually described in the 1967 deed. Veibell described in detail the facts surrounding their negotiations, and the Partnership presented no evidence to refute his testimony. Additionally, the location of the survey pin belonging to Edwin Moser, the surveyor hired to survey the property in 1967, indicates that Moser did not err in calculating the length of the northern boundary and thus that the eastern record boundary is consistent with the parties' intent.

¶ 52 The trial court mistakenly reformed the eastern boundary to lie "closer to the existing [Willow Creek] fence line." Both Veibell and Paul Palmer testified that the southern portion of the fence was a fence of convenience that was intentionally not placed on the true boundary to allow the Ericksens' livestock to access Willow Creek. Thus, the testimony regarding the placement of the fence instead supports the conclusion that the parties intended to locate the eastern boundary over fifty feet west of the southern portion of the fence, in a position closer to that described by the 1967 deed.

¶ 53 After weighing the evidence presented at trial in light of our conclusion that the parties erroneously believed they were transferring seventy-five acres, we hold that the trial court's determination that the parties intended to transfer property along the reformed boundary is clearly erroneous. Rather, the evidence indicates that the parties

intended to transfer property along the specific eastern boundary described in the 1967 deed.

### D. Closing the Property Description

¶ 54 Having determined the proper placement of the eastern boundary, we are still left with the question of how to reform the deed to close the property description. Where the parties intended to convey property along specific boundaries but the deed description fails to close, a court in equity may reform the deed to cause the description to close. *Naisbitt v. Hodges*, 6 Utah 2d 116, 307 P.2d 620, 624 (1957) (reforming a deed that failed to close); *see also Ault v. Holden*, 2002 UT 33, ¶¶ 26–30, 44 P.3d 781 (closing a faulty deed description in a construction proceeding). Reformation is appropriate because the parties intended the boundaries of the conveyed property to close.

¶ 55 The 1967 deed describes the southern boundary as follows: "[T]hence West 927.7 feet along said South line of Section 23, to the N–S centerline of said Section 23." As is, the southern boundary description extends over 100 feet beyond the N–S centerline, onto property that Veibell did not own at the time of the transfer and could not have intended to include in the transfer. Because Veibell did not own and thus could not convey property beyond the N–S centerline and because monuments take precedence over distance, the call to the N–S centerline is more reliable than the 927.7 foot call of the southern boundary. *See Park v. Wilkinson*, 21 Utah 279, 60 P. 945, 946 (1900) ("In a conveyance by natural monuments, distances and quantity, being the most uncertain, must yield to the former."); Thomas & Backman, *supra*, ¶ 44, § 13.05(b)(7)(i)(D)(8) ("The special locative calls are more precise and particular and thus prevail over the descriptive calls in case of conflict."). We therefore hold that the deed description of the southern boundary be reformed to read "thence West 816.75 feet along said South line of Section 23, to the N–S centerline of said Section 23" so that the property description closes. The

1967 deed thus conveyed 64.5 acres instead of 75.8 acres as the deed purports.

## CONCLUSION

¶ 56 We affirm the trial court's finding of mutual acquiescence as to the east triangle. We reverse the trial court's reformation of the metes and bounds description contained in the 1967 deed. We hold that the property description in the deed should instead be reformed to shorten the length of the southern boundary of the conveyed property so that the description closes.

¶ 57 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM'S opinion.

## Map of the Property