**2020 UT App 108**

## THE UTAH COURT OF APPEALS

SARAH LINEBAUGH,
Appellant and Cross-appellee,

*v.*

RUSSELL L. GIBSON, ROBERT P. GIBSON, ANDY NEGRETTE, AND
HUNTER ELDRACHER,
Appellees and Cross-appellants.

Opinion
No. 20180237-CA
Filed July 16, 2020

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 150903119

Michael N. Zundel and James A. Boevers,
Attorneys for Appellant and Cross-appellee

Bradley L. Tilt and Sara E. Bouley,
Attorneys for Appellees and Cross-appellants

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES KATE APPLEBY and DAVID N. MORTENSEN concurred.

ORME, Judge:

¶1     This case demonstrates that the old proverb to "Love your neighbor, but don't pull down the fence"[1] is a sound principle. Neither part of that advice was followed in this case. Russell and

---

1. This German proverb reflects something of a universal precept. *See* Wolfgang Mieder, *The Prentice Hall Encyclopedia of World Proverbs* 346 (1986). The English version of the proverb is, "Love your neighbor yet pull not down your hedge," and the Hindi version admonishes, "Love your neighbor, but do not throw down the dividing wall." *Id.*

Robert Gibson (collectively, the Gibsons), through their contractor, Andy Negrette, removed a fence that had been in more or less the same location for nearly sixty-four years[2] and erected a new cement retaining wall approximately two feet farther north. This wall was still within the Gibsons' deeded property line (the Gibson Property), but by the time they removed the old fence these two feet had become part of the backyard that appellant Sarah Linebaugh and her predecessors in interest had used and occupied for decades.

¶2 Linebaugh appeals the trial court's ruling, following a bench trial, that she failed to establish all the elements of boundary by acquiescence to the previous fence line and that the Gibsons and Negrette[3] did not trespass on her land. Linebaugh also challenges the court's grant of summary judgment in favor of the Gibsons, Negrette, and Hunter Eldracher (collectively, Appellees) on her claim for intentional infliction of emotional distress (IIED).[4] Appellees cross-appeal, asserting that the court erred in declining their request for attorney fees and costs under Utah Code section 78B-5-825(1). We reverse the court's boundary by acquiescence and trespass rulings and remand for a

---

2. This fence followed a seemingly straight boundary line along the property owned by appellant Sarah Linebaugh and that of the neighbor to the west, and it was in line with the fence of the neighbor to the east before that fence jogged slightly to the north. *See* Appendix.

3. When describing the actions of Negrette, we refer to the actions he personally took along with the actions taken by his construction crew.

4. Linebaugh also brought claims for assault and boundary by estoppel. The trial court likewise dismissed these claims, and Linebaugh does not appeal that ruling.

determination of damages. We affirm the court's grant of summary judgment in favor of Appellees on Linebaugh's IIED claim and its denial of attorney fees to Appellees.

BACKGROUND[5]

*The Fence*

¶3    In 1951, the then-owner of the Gibson Property erected a v-mesh fence along the northern side of the property for the purpose of confining animals, primarily sheep and horses. This fence was approximately two feet short of the Gibson Property's deeded boundary line, and it ran east to west roughly parallel to that line. The southern boundary of Linebaugh's property (the Linebaugh Property) borders a large portion of the northern deeded boundary of the Gibson Property. *See* Appendix.

¶4    In 1985, Russell Gibson purchased the Gibson Property, and in 1996, he and his brothers, including Robert,[6] replaced the old v-mesh fence with a different v-mesh fence that they removed from the front of the Gibson Property. The trial court

---

5. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard" and only "present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *Kidd v. Kidd*, 2014 UT App 26, n.1, 321 P.3d 200 (quotation simplified). "[W]hen reviewing a grant of summary judgment, we recite the disputed facts in a light most favorable to the nonmoving party." *Begaye v. Big D Constr. Corp.*, 2008 UT 4, ¶ 5, 178 P.3d 343.

6. Because Robert and Russell share the same surname, we refer to them by their first names with no disrespect intended by the apparent informality.

found that "the fence was rebuilt and in some but not all spots the middle fence posts were moved further north towards [the Gibson Property's] northern deeded property line." It also found that "[t]he fence was moved northward and pushed up against trees and bushes, however, the end posts of the fence on both ends of the fence remained unchanged."

¶5     The reason for this repair/rebuild was the deteriorating condition of the fence and the need to prevent dogs from escaping the property. Russell testified that they moved "[p]robably ninety percent of [the fence]." When asked whether rebuilding the fence would "disturb the earth so that your neighbor would see that [it] had [been] moved," Russell conceded that it would not have been obvious, after earlier stating that they "weren't making a major project." The court also found that "[Linebaugh's] predecessor in interest that owned the [Linebaugh Property] when the fence was rebuilt and moved, testified there was a V-mesh fence when they purchased the property, but they did not think it had been moved." The court ultimately found that the "fence line, as constructed [in 1951], running east and west, was on 'approximately' the same east/west fence line occupied by the [1996] V-Mesh Fence."

¶6     The court found that from 1951 until 2015, "none of the predecessors in interest to [the Linebaugh Property] ever had any discussions with anyone about the boundaries of their property" and that "[i]t [was] undisputed, a fence was built in 1951 . . . to contain sheep and horses." The court also found that "[t]he occupants of the Gibson Property never used any of the property north of the V-Mesh Fence [from 1976 to 2015]," while Linebaugh and her predecessors "used the entirety of the property between their home and the V-Mesh Fence as their backyard."

¶7     Following a bench trial, the court ruled against Linebaugh, determining that she "fail[ed] to establish the required elements of boundary by . . . acquiescence by clear and

convincing evidence on the fourth element required, as the period for at least twenty years has not been shown." The court also ruled that because the fence was built for the purpose of animal containment rather than to demarcate a boundary, Linebaugh could not prove the third element, mutual acquiescence.

*IIED[7]*

¶8     On April 23, 2015, the Gibsons and Negrette were near the v-mesh fence and having a discussion about removing it and building a new cement retaining wall approximately two-and-a-half feet north of the fence. During this discussion, Linebaugh approached them, and they told her of their plans. She informed them that she was opposed to the fence being torn down and a wall being built into her backyard. Linebaugh attempted to discuss the wall in more detail with Russell, who was the only one of the three she knew, but Robert would not let her, telling her, "Don't talk to Russ, he is too sick, he can't deal with this" and that he, Robert, was in charge of the project. Linebaugh asked for Russell's phone number, but Robert refused to provide it and instead gave her his own number.

¶9     Later that same day, Linebaugh called Robert and told him that she had consulted an attorney and did not believe that they had the right to build a new wall north of the v-mesh fence line as this area was legally her backyard. According to

---

7. Because we ultimately agree with the trial court that Linebaugh's IIED claim fails as a matter of law, we will assume for purposes of the opinion that the facts recited by Linebaugh in support of her claim are true, just as the trial court did below. We note that Appellees dispute many of the facts as stated by Linebaugh, but because we affirm the court's grant of summary judgment in Appellees' favor on this claim, we need not highlight or attempt to resolve the disputed facts.

Linebaugh, Robert "was yelling incoherently" during the call and told her that "it would cost her all of her money if she sued" because Russell was a millionaire. Linebaugh later placed a letter, dictated by her attorney father, in Russell's mailbox, which informed the Gibsons that they had "no . . . right to any portion of [her] property north of the fence that currently separates [their properties]."

¶10 A few days later, Linebaugh and her father delivered a copy of the letter to Negrette in front of the Gibson Property and discussed the boundary dispute with him. That evening, Robert went to Linebaugh's front door seeking the name and phone number of her attorney and demanding that she stop interfering with his contractor. Linebaugh claimed that, during this interaction, Robert said, "[I'm] going to take you to court if you do not stop threatening my contractor." He also said he would stop work only if a court ordered him to do so and told her, "I am going to wipe that smile off your face, bitch." A few minutes after Robert left, he asked via text message for the spelling of Linebaugh's father's surname and, after receiving it, texted back, "Thanks. See you in the morning. :)." About an hour after this exchange, Linebaugh received three text messages from an unknown number that stated, "When you fuck with a crazy person you must realize that they could fuck you back 5 times harder"; "War has a way of removing the smile from peoples faces for 20 years or more"; and "War is really bad when you bring it to your own home."

¶11 Two days later, Linebaugh received additional text messages from the same unidentified number stating, "Strike one cunt you missed yours today but I didnt lol lol lol I love a good game" and "Ps porch lights wont help." Finally, the next day Linebaugh received the last text message from the number. It said, "Good night sweet cheeks hope you have the company all night sweet dreams lol."

¶12 During construction of the wall, which proceeded despite Linebaugh's protests, she took video and photographs of the construction. During the course of her documentation efforts, Eldracher, the Gibsons' nephew, told Linebaugh that her attempts to stop the project were "truly pathetic." During this interaction, Eldracher did not cross over to Linebaugh's side of the old v-mesh fence line.

¶13 Linebaugh claimed: "[Appellees'] statements to me and the body language of Robert and [Eldracher] toward me was intimidating and demeaning and made me feel extremely helpless and fearful for my safety," which "made me cry," "shak[e]," "afraid," "worried," and unable to "sleep for six days."[8] Linebaugh also stated that she did not seek a temporary restraining order from the court "out of fear that I would incite even more violent and abusive behaviors from [Appellees] against me, or people I love, or my pets."

¶14 Appellees moved for summary judgment on Linebaugh's IIED claim. The court granted the motion, relying on a stipulated order reciting, among other things, that prior to Appellees' alleged conduct, Linebaugh had been treated by medical professionals "for various physical, mental, and/or psychological

---

8. While it is clear from the record that Negrette's conduct toward Linebaugh was at all times appropriate and civil, Linebaugh still initially brought the IIED claim against the Gibsons, Eldracher, and Negrette. Linebaugh eventually moved to dismiss this claim against Negrette, but the trial court denied her motion as moot because it had granted summary judgment in favor of all Appellees. Thus, while there was no uncivil conduct by Negrette, for convenience we refer collectively to the complained-of behavior supporting Linebaugh's IIED claim as attributable to Appellees as a whole, while noting that Negrette's conduct was appropriate.

claims and issues."[9] The order also included the stipulation that after Appellees' alleged conduct, "[Linebaugh] continued to be seen, evaluated, and otherwise treated from time to time by various Medical Experts [for the same issues]." The order further outlined that "[Linebaugh] did not see, report to, or receive evaluations or treatments from, any Medical Experts any more frequently after the events [at issue]." Finally, the parties

---

9. Linebaugh takes issue with the trial court's use of the stipulated order in its summary judgment ruling, specifically its statement that "[Linebaugh] admitted, and this Court has already ordered, . . . that any distress [Linebaugh] claims to have experienced, no matter how severe, was not 'in any way due to the events and/or occurrences that allegedly are the subject of this case.'" Linebaugh claims that "[i]t is not fair for the district court to recast and misquote [her] stipulation, as it did, as a basis for its ruling and judgment" because "[t]he only fair reading of [her] stipulation is that her medical history was not going to be part of the trial of her claims." We disagree. The stipulated order stated, "Each and all of the following [facts] are hereby entered as findings of fact in this case, which may and shall be adopted and otherwise incorporated into each, any, and every ruling(s) of any type, nature, or description whatsoever which the Court may hereinafter render upon the merits of this case." Linebaugh's protest of the court's use of this order is also unavailing because, during her deposition, she stated that she did not "start[] any new medications" or have the dosages of her existing prescriptions altered as a result of Appellees' conduct and had not been "treated by any health care providers for anything relating to this case." Thus, Linebaugh clearly stipulated, and also stated in her deposition, that she did not seek further treatment and experienced no exacerbating problems with her previous medical conditions as a result of the claimed emotional distress. The court therefore properly used these admissions in its ruling.

stipulated that Linebaugh's treatments did not change after Appellees' alleged conduct, that she did not mention any of the alleged conduct to her physicians, and that she did not seek additional treatment as a result of the alleged conduct. The court also noted that "[Linebaugh] admitted that she did not leave her several journalist jobs, nor even work any less, due to or relating to anything alleged in this case." Ultimately, based on these facts, the court granted summary judgment in favor of Appellees on the IIED claim, stating, "Even assuming the truth of the alleged conduct, and further, that such rose to the level of 'extreme and outrageous,' [Linebaugh's] claim still fails because her admissions show as a matter of law she has not suffered the requisite severe emotional distress."

*Trespass*

¶15   In preparation for construction of the wall, the Gibsons removed the v-mesh fence and cut down a part of Linebaugh's lilac bush that had been touching the fence. Linebaugh called the police, who responded but did not issue a citation.

¶16   Prior to the removal of the v-mesh fence, a planting bed had been established on the Linebaugh Property up to the fence, with shrubbery and garden borders along with decorative stones at the base of the fence. Once construction began, Negrette moved the stones farther north, removed a bush with a backhoe, and removed and transplanted other shrubs to locations of his own choosing within the planting bed. The court also found that one of the transplanted bushes had been moved a "few feet to the northeast." Linebaugh also video-recorded the construction crew walking in the planting bed, pulling on her lilac bush, and walking on her grass in the process.

¶17   Approximately two weeks before the Gibsons informed Linebaugh of their intent to remove the v-mesh fence, Linebaugh hired a landscaper to work on her yard. She paid $1,060 for these services and estimated that twenty percent, or $212, of the

landscaper's work was performed in the area of the planting bed that went up to the v-mesh fence line and was ruined in the course of the wall's construction. She also claimed approximately $100 for damage done to her lilac bush and other shrubbery.[10]

¶18 Following a bench trial, the court again ruled against Linebaugh, finding that "there has not been a trespass by [the Gibsons and Negrette] on the portion of the property [Linebaugh] asserted as her own due to boundary by acquiescence." It also found that "the cutting and trimming of trees and plants which came through the fence . . . before the fence was taken down for the construction of the cement wall does not constitute a trespass under the law as this vegetation intruded upon [the Gibson P]roperty." Finally, it ruled that Negrette "may have entered onto [Linebaugh's] deeded land by an inch or two, however, such action was de minimis and caused no damage to [Linebaugh]." The court also denied Appellees' motion for attorney fees, finding that Linebaugh did not bring her claims in bad faith.

¶19 Linebaugh appeals and Appellees cross-appeal.

ISSUES AND STANDARDS OF REVIEW

¶20 Linebaugh raises three issues that merit our consideration.[11] First, she asserts that the trial court erred in

---

10. At trial, Linebaugh testified that although she initially sought removal of the wall, she now wanted the wall to remain. She also testified that she intended to build a privacy fence on top of it.

11. Linebaugh raises two additional issues. First, she asserts the trial court erred "when it found that [her] conduct was morally and economically equivalent to the Gibsons' trespasses . . . even

(continued…)

rejecting her boundary by acquiescence claim. "We review the trial court's conclusions of law on this issue for correctness, according the trial court no particular deference." *RHN Corp. v. Veibell*, 2004 UT 60, ¶ 22, 96 P.3d 935 (quotation simplified). But "we will not reverse the findings of fact of a trial court sitting without a jury unless they are clearly erroneous." *Id.* (quotation simplified).

¶21 Second, Linebaugh contends that the trial court "erred in finding only a de minimis trespass of 'an inch or two' during Gibsons' construction." "This issue raises questions of law pertaining to the tort of trespass," which we review "for correctness." *Carter v. Done*, 2012 UT App 72, ¶ 7, 276 P.3d 1127. *See Purkey v. Roberts*, 2012 UT App 241, ¶ 11, 285 P.3d 1242. ("Whether the trial court applied the proper legal standard for trespass is an issue of law, which we review for correctness.").

¶22 Third, Linebaugh argues that the trial court erred in dismissing her claim for IIED. "We review a district court's decision to grant summary judgment for correctness, granting no deference to the district court's conclusions." *Gillmor v. Summit County*, 2010 UT 69, ¶ 16, 246 P.3d 102 (quotation simplified).

---

(…continued)

though no counter-claim was made in the pleadings for trespass." Second, she argues that "the district court erred in failing to recognize that Utah law does not condone the Gibsons' attempts to resolve th[e] boundary dispute through physical aggression, threats and intimidation." We have considered these issues and, in the context of this case, conclude that they are without merit and decline to discuss them further. *See State v. Carter*, 776 P.2d 886, 888 (Utah 1989) ("[I]t is a maxim of appellate review that the nature and extent of an opinion rendered by an appellate court is largely discretionary with that court.").

¶23　Appellees cross-appeal, arguing that the trial court erred in declining to award them attorney fees and costs, because "[Linebaugh's] claims all were 'without merit and not brought or asserted in good faith' under Utah Code [section] 78B-5-825(1)."[12] "An award of fees under this provision requires

--------

12. Additionally, Appellees ask us to sanction Linebaugh pursuant to rule 33 of the Utah Rules of Appellate Procedure. They assert that Linebaugh's claim in her reply brief that Appellees made misrepresentations in their opening brief are "meritless and sanctionable." Linebaugh likewise seeks rule 33 sanctions against Appellees, arguing that their "principal brief repeatedly misrepresents both the facts of this case, and the district court's findings regarding those facts" and that their "cross appeal from the district court's denial of their motion for award of attorney fees . . . is frivolous . . . [as they] set forth no evidence, as opposed to argument, contesting the district court's finding that [Linebaugh] did not bring any of her claims in 'bad faith.'" "Under rule 33, we have the authority to award attorney fees and costs as a sanction for a frivolous appeal. But the imposition of such a sanction is a serious matter and only to be used in egregious cases." *Redd v. Hill*, 2013 UT 35, ¶ 28, 304 P.3d 861 (quotation simplified). After a review of the record and all the asserted misrepresentations made by both sides, it is clear that no party is in a position to cast the first stone. Both sides attempted to twist and manipulate the trial court's findings and rulings to suit their arguments while attacking the other side for doing the same. We decline to impose sanctions, on essentially the same rationale as the football rule on offsetting personal fouls.

　　We cannot help but wonder, however, if much of the back and forth between counsel on appeal, which has consumed not only our energies but also the resources of Linebaugh and Appellees, could have been avoided had counsel for both sides more assiduously adhered to the first rule of the Utah Standards

(continued…)

a determination that the losing party's claim was (1) without merit, and (2) not brought or asserted in good faith." *Rocky Ford Irrigation Co. v. Kents Lake Reservoir Co.*, 2019 UT 31, ¶ 67 (quotation simplified). In reviewing a trial court's decision to deny or grant attorney fees under this provision, we apply a two-part standard of review. *Id.* ¶ 68. First, "a determination . . . as to the merits of a claim typically will turn on a conclusion of law—as to whether the losing party's claim lacks a basis in law or fact"—which "is reviewed for correctness." *Id.* (quotation simplified). Second, "whether a claim has not been brought or asserted in good faith is a question of fact and we review it under a clearly erroneous standard." *In re Discipline of Sonnenreich*, 2004 UT 3, ¶ 45, 86 P.3d 712 (quotation simplified). And because the good faith element "implicates fact-intensive questions about the losing party's subjective intent[,] . . . a lower court's finding on this element typically will be afforded a

---

(…continued)

of Professionalism and Civility, which directs attorneys to avoid "reflecting any ill-will that clients may have for their adversaries" and to "treat all other counsel . . . in a courteous and dignified manner." Utah Standards of Professionalism & Civility 1. Additionally, it seems to us that both the Gibsons and Linebaugh could have handled the initial dispute more appropriately and that they all acted in an overly zealous manner, drastically escalating an issue that could have been easily and more civilly resolved. It seems all but certain that counsel did not "advise their clients that civility, courtesy, and fair dealing are expected" as "[t]hey are tools for effective advocacy and not signs of weakness." *Id.* R 2. In sum, we take umbrage at the behavior of all involved—with the exception of Negrette—and implore the parties and their counsel, going forward, to avoid the uncivil and contentious tone that has prevailed from the moment this dispute arose.

substantial measure of discretion." *Rocky Ford Irrigation*, 2019 UT 31, ¶ 68 (quotation simplified).

ANALYSIS

I. Boundary by Acquiescence

¶24    Linebaugh asserts that her property boundary extended all the way to the v-mesh fence by virtue of boundary by acquiescence and that the trial court erred in concluding that her claim failed because the fence was first built to contain animals and also did not meet the twenty-year requirement. We agree.

¶25    The "boundary by acquiescence doctrine requires a claimant to show: (1) a visible line marked by monuments, fences, buildings, or natural features treated as a boundary; (2) the claimant's occupation of his or her property up to the visible line such that it would give a reasonable landowner notice that the claimant is using the line as a boundary; (3) mutual acquiescence in the line as a boundary by adjoining landowners; (4) for a period of at least 20 years." *Anderson v. Fautin*, 2016 UT 22, ¶ 31, 379 P.3d 1186. To prevail on a claim of boundary by acquiescence, a claimant must prove each element "by clear and convincing evidence." *Essential Botanical Farms, LC v. Kay*, 2011 UT 71, ¶ 34, 270 P.3d 430. Because the first two elements of this test are not in dispute, we limit our analysis to mutual acquiescence and the twenty-year period.

A.    Mutual Acquiescence

¶26    Parties acquiesce in a boundary when they "recognize and treat an observable line, such as a fence, as the boundary dividing the owner's property from the adjacent landowner's property." *RHN Corp. v. Veibell*, 2004 UT 60, ¶ 24, 96 P.3d 935

(quotation simplified). Acquiescence "is a highly fact-dependent question," and acquiescence "may be tacit and inferred from evidence [that] the landowner's actions with respect to a particular line may evidence the landowner impliedly consents, or acquiesces, in that line as the demarcation between the properties." *Id.* (quotation simplified). Acquiescence "is an objective determination based solely on the parties' actions in relation to each other and to the line serving as the boundary." *Essential Botanical Farms*, 2011 UT 71, ¶ 27.

¶27 Mutual acquiescence may "be shown by silence, or through failure by the record title owner to suggest or imply that the dividing line between the properties is not in the proper location." *Id.* (quotation simplified). *See Fautin*, 2016 UT 22, ¶ 21 ("[T]he mutual acquiescence element merely requires silence or indolence by a nonclaimant who may or may not occupy his or her property."). "Nonacquiesence in a boundary would be signaled where a landowner notifies the adjoining landowner of her disagreement over the boundary, or otherwise *takes action* inconsistent with recognition of a given line as the boundary." *Essential Botanical Farms*, 2011 UT 71, ¶ 27 (emphasis in original) (quotation simplified). Ultimately, "a party's subjective intent has no bearing on the existence of mutual acquiescence" because such acquiescence "is based on the objective behavior of the adjacent landowners regardless of their subjective intent to act in such a manner." *Id.* A party's subjective belief will be considered evidence of mutual acquiescence only "to the extent that such understanding is based on the objective actions of the landowners." *Id.* ¶ 28.

¶28 The trial court erred in concluding that because the fence was built for animal containment, the Gibsons and their predecessors could not have acquiesced in the fence serving as the boundary line between the properties. Simply put, the court and Appellees misread Utah case law on the issue. Citing *Hales v. Frakes*, 600 P.2d 556, 559 (Utah 1979), and other

Utah Supreme Court and Utah Court of Appeals opinions, Appellees assert that if a fence is built to confine animals, the landowner cannot acquiesce in the fence serving as a boundary because the landowner who built the fence "did not intend the fence to be the boundary." In essence, they contend that the initial intent that the fence be used to contain animals renders any subsequent interaction between the nonclaimant property owner and the claimant immaterial. But this reasoning and the cited authority does not comport with logic or with recent opinions from our Supreme Court.[13] In *Essential Botanical Farms*, 2011 UT 71, our Supreme Court made it absolutely clear that a claim for boundary by acquiescence "is determined by the parties' *objective actions* in relation to the boundary and not their mental state." *Id.* ¶ 14

---

13. In addition, *Hales v. Frakes*, 600 P.2d 556 (Utah 1979), is not as compelling as Appellees suggest. Although our Supreme Court declined to overturn the trial court's ruling in that case that there had been no boundary by acquiescence because the purpose of the fence was to contain animals, additional facts convinced the Court this was appropriate, such as the fence being "purposely offset so as to be south of [an] expected road" and that there was no "substantial evidence" the nonclaimant "recognize[d] the fence as a boundary." *Id.* at 559. Therefore, even prior to our Supreme Court's recent clarification of the boundary by acquiescence doctrine, it still looked to the parties' objective actions and other factors before making a determination, clearly indicating that the purpose of the fence alone was not the dispositive factor but one of many courts should consider in determining mutual acquiescence. *Cf. Van Dyke v. Chappell*, 818 P.2d 1023, 1027 (Utah 1991) (holding that the trial court correctly found mutual acquiescence where the evidence showed that the fence was built "as a livestock barrier, a boundary line, *or both*") (emphasis added).

(emphasis added). Additionally, in *Fautin*, 2016 UT 22,[14] the Supreme Court stated,

> Our failure to separate boundary by acquiescence from boundary by agreement led to an additional unfortunate consequence. Specifically, we began to require evidence from which we could infer that a nonclaimant expressly consented to treat a visible line as a boundary. This distorted the notion of *acquiescence*, which merely requires passive assent . . . .

---

14. Appellees, and the trial court in its order, assume that *Anderson v. Fautin*, 2016 UT 22, 379 P.3d 1186, deals only with a single element of boundary by acquiescence and therefore is not controlling in this case. The fact that our Supreme Court stated that the "case raises a single legal question: does the occupation element in our boundary by acquiescence doctrine require a claimant to prove that both owners of adjoining land occupied their respective parcels up to a visible line," *id*. ¶ 1, this does not render everything else the Court stated about boundary by acquiescence nonbinding. In fact, the Court stated later in the opinion, "As the parties' arguments demonstrate, we have made inconsistent articulations and applications of both the occupation element *and the mutual acquiescence element* in our precedent . . . [and] we must [now] consider the ways in which *these two* related doctrines have shaped our boundary by acquiescence jurisprudence." *Id*. ¶ 10 (emphasis added). It therefore seems to us that *Fautin* is an appropriate case to rely on in determining any boundary by acquiescence case because the Court used it to correct its past oversight in blurring the mutual acquiescence and occupation elements, and *Fautin* is controlling on the issue.

*Id.* ¶ 18 (emphasis in original). Thus, the fact that a fence is built with the initial objective of containing animals—as opposed to where such a fence is built and how the parties thereafter regard it—is not dispositive. The Supreme Court has explicitly held that "a party's subjective intent has no bearing on the existence of mutual acquiescence." *Essential Botanical Farms*, 2011 UT 71, ¶ 27.

¶29 In the present case, the fact that the Gibsons' predecessors in interest built the fence to confine their animals might tend to suggest that they did not acquiesce in the fence as a boundary, as would be the case if they constructed a pen well within their own boundary and thereafter treated the property between the one side of the pen and the legal boundary as their own, thereafter weeding and watering that ground, for instance. But their objective actions afterward did not in any way convey such an intent to Linebaugh's predecessors.[15] In fact, the contrary is true. In its findings, the trial court stated that "none of the predecessors in interest to [Linebaugh's] property ever had any discussions with anyone about the boundaries of their property," that "[i]t [was] undisputed [that] a fence was built in

---

15. The trial court did find that "[Linebaugh] and her predecessors in interest knew of and were aware of animals being contained by the fence." The fact that a fence confines animals does not conclusively establish a lack of mutual acquiescence. There still must be objective actions on the part of the non-claiming landowner to convey to the boundary-by-acquiescence claimant that the non-claiming landowner objects to the fence serving as the boundary. *See Staker v. Ainsworth*, 785 P.2d 417, 420–21 (Utah 1990) ("There is no indication in the record that any predecessor in interest behaved in a fashion inconsistent with the belief that the fence line was the boundary. Owners occupied houses, constructed buildings, farmed, irrigated, and *raised livestock* only within their respective fenced areas.") (emphasis added).

1951," and that "[t]he occupants of the Gibson Property never used any of the property north of the V-Mesh Fence [from 1976 to 2015]," while Linebaugh and her predecessors "used the entirety of the property between their home and the V-Mesh Fence as their backyard."

¶30 The trial court's findings establish that there was acquiescence on the part of the Gibsons and their predecessors that the v-mesh fence served as the boundary line between the two properties. The fact that the various landowners never discussed the boundaries, combined with the fact that Linebaugh and her predecessors—for decades—used the property up to the fence that acted as the boundary between the properties, overcomes any notion that the Gibsons or their predecessors in interest could not have acquiesced to the fence serving as the boundary line solely because it was initially built to contain animals.[16] In this regard, it is noteworthy that the fence here followed a seemingly straight boundary line across two properties—the Linebaugh Property and the neighbor to the west—and was in line with the fence of the neighbor to the east for several feet before that fence jogged slightly to the north. *See Van Dyke v. Chappell*, 818 P.2d 1023, 1027 (Utah 1991) ("[E]vidence that provides further support for the finding that the fence was intended as a boundary consisted of the fact that the fence was in line with the rest of the fences that ran across

---

16. The trial court's and Appellees' reliance on the fence being built for the confinement of animals is overblown. It is not inimical to a fence marking a boundary that its immediate purpose is to keep animals on the property. *See Van Dyke v. Chappell*, 818 P.2d 1023, 1027 (Utah 1991) (holding that a fence that is acting "as a livestock barrier" can also act as "a boundary line"); *Staker v. Ainsworth*, 785 P.2d 417, 420–21 (Utah 1990) (holding that a fence acted as a boundary even though the parties raised livestock within the fenced areas).

the valley."). And the Gibsons, Linebaugh, and their predecessors in interest did not behave "in a fashion inconsistent with the belief that the fence line was the boundary." *See Staker v. Ainsworth*, 785 P.2d 417, 420–21 (Utah 1990).

¶31 Thus, the Gibsons and their predecessors' failure through their objective actions "to suggest or imply that the dividing line between the properties" was not the correct boundary conclusively establishes, as a matter of law, that the Gibsons and their predecessors acquiesced in the v-mesh fence serving as the boundary line.[17] *See Essential Botanical Farms*, 2011 UT 71, ¶ 27 (quotation simplified). *See also Ault v. Holden*, 2002 UT 33, ¶ 20, 44 P.3d 781 (holding that property owners must "take some action manifesting that they do not acquiesce or recognize the particular line, e.g., a fence, as a boundary between the properties").

¶32 The objective behavior of the Gibsons and their predecessors, in doing nothing for decades to disavow the fence's demarcation of the boundary, overcomes any subjective reason—animal containment or otherwise—they had for building the fence at that location in the first place. Ultimately, "the undisputed facts are clear and convincing evidence that the [Gibsons, Linebaugh, and their predecessors in interest] mutually acquiesced by recognizing and treating the fence as the boundary between their properties." *See Essential Botanical Farms*, 2011 UT 71, ¶ 29.

B.      Twenty-Year Requirement

¶33 The trial court's second error in considering boundary by acquiescence was in finding that the twenty-year requirement

---

17. Nor did the Gibsons' repair of the v-mesh fence in 1996 convey to their then-neighbors any objection to the fence serving as the boundary line. *See infra* ¶ 34.

had not been met. Although the court found the fence was built in 1951, at trial Linebaugh was able to present direct evidence of the fence's location only from 1976 to 2015. We therefore limit our analysis to the period from 1976 to 2015.

¶34    The trial court concluded that Linebaugh did not meet the twenty-year requirement because in 1996, the Gibsons moved the fence, thus breaking the timeline.[18] We conclude this determination was in error. The Gibsons' efforts in repairing the fence in 1996 did not properly convey to Linebaugh's predecessors any objection to the fence serving as the boundary. When asked at trial whether rebuilding the fence would "disturb the earth so that [his] neighbor would see that [it] had [been] moved," Russell responded that it would not have, and he earlier stated that they "weren't making a major project." The court found that "the fence was rebuilt and in some but not all spots the middle fence posts were moved further north towards [the Gibson Property's] northern deeded property line" but "the end posts of the fence on both ends of the fence remained unchanged." The court also found that "[Linebaugh's] predecessor in interest that owned the property when the fence was rebuilt and moved testified there was a V-mesh fence when they purchased the property, but they did not think it had been moved." The court ultimately concluded that the "fence line, as constructed [in 1951], running east and west, was on 'approximately' the same east/west fence line occupied by the [1996] V-Mesh Fence." Thus, the court erred in determining that the 1996 repair either signaled the Gibsons' objection to the fence serving as the boundary line or restarted a new twenty-year period. *Cf. Clair W. & Gladys Judd Family Ltd. P'ship v. Hutchings*, 797 P.2d 1088, 1090 (Utah 1990) (holding that the landowner acquiesced in the boundary even though during the twenty-year

─────────────────

18. Linebaugh initiated suit in 2015—39 years into the period in question but only 19 years after the repair.

period "the fence was repaired and posts replaced, except for the two corner posts, which remained undisturbed up to the time of trial"), *modified on other grounds by Van Dyke v. Chappell*, 818 P.2d 1023 (Utah 1991).

¶35　Because the court found that the v-mesh fence remained in essentially the same place between 1976 and 2015, and the Gibsons did not take any actions during that time that would have objectively conveyed their opposition to the fence serving as the boundary line, either before or after the repairs, the twenty-year-period requirement was easily met and the court erred in determining otherwise.

## II. Trespass

¶36　"A person is liable for trespass when, without permission, he intentionally enters land in the possession of another, or causes a thing or a third person to do so." *Purkey v. Roberts*, 2012 UT App 241, ¶ 17, 285 P.3d 1242 (quotation simplified). *See O'Neill v. San Pedro, L.A. & S.L.R. Co.*, 114 P. 127, 128 (Utah 1911) ("In law every entry upon the soil of another, in the absence of lawful authority, without the owner's license, is a trespass.") (quotation simplified).

¶37　As a result of a trespass, a plaintiff generally will receive compensatory and/or nominal damages "whether or not the defendant intentionally entered the plaintiff's property." *Gallegos v. Lloyd*, 2008 UT App 40, ¶ 11, 178 P.3d 922. "[T]he amount of damages recoverable for trespass, because of the nature of the tort, is integrally related to the extent of the defendant's interference with both the land and the plaintiff's possessory interests." *Walker Drug Co. v. La Sal Oil Co.*, 972 P.2d 1238, 1244 (Utah 1998). Usually, "[t]he measure of [compensatory] damages for trespass on real property and destruction thereon is . . . the difference between the value of the property before and after the trespass." *Pitts v. Pine Meadow Ranch, Inc.*, 589 P.2d 767, 769 (Utah 1978). However, in addition to "compensation for

diminution in the land's value" a plaintiff may recover "compensation for any personal or property injury that resulted from the encroachment on the land." *Walker Drug*, 972 P.2d at 1244. "To prove these types of damages, a plaintiff must prove the extent of the defendant's invasion and the gravity of the interference with the plaintiff's possessory rights, facts which also establish liability." *Id.* at 1244–45. But "[i]n circumstances where no substantial damages result [from the trespass] and none are proved, the law will infer nominal damages," *Henderson v. For-Shor Co.*, 757 P.2d 465, 471 (Utah Ct. App. 1988), for which "one dollar is the amount generally awarded," *Fashion Place Assocs. v. Glad Rags, Inc.*, 754 P.2d 940, 942 (Utah 1988).

¶38   Plaintiffs may also recover punitive damages "for even a harmless trespass" if they can prove that the defendant committed the trespass with a "complete disregard of [their] legally protected interest in the exclusive possession of [their] land." Restatement (Second) of Torts § 613 cmt. e (Am. Law Inst. 1965). *Accord Purkey*, 2012 UT App 241, ¶ 20. Thus, "[w]hether the trespasser had a wrongful intent becomes relevant only when a property owner seeks punitive damages." *Purkey*, 2012 UT App 241, ¶ 20. "Before punitive damages may be awarded," however, "the plaintiff must prove conduct that is willful and malicious or that manifests a knowing and reckless indifference and disregard toward the rights of others." *Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 337 (Utah 1985) (citations omitted). "Although punitive damages may be awarded in an appropriate case, the general rule is that only compensatory damages are appropriate and that punitive damages may be awarded only in exceptional cases." *Behrens v. Raleigh Hills Hosp., Inc.*, 675 P.2d 1179, 1186 (Utah 1983). Ultimately, "punitive damages are not intended as additional compensation to a plaintiff" but are meant to "serve a societal interest of punishing and deterring outrageous and malicious conduct which is not likely to be deterred by other means." *Id.*

¶39 As explained in section I, the trial court erred in concluding that Linebaugh's property did not extend to the line of the v-mesh fence. Thus, the new cement wall itself constituted a trespass, and the Gibsons' and Negrette's related actions that occurred beyond the old v-mesh line were also a trespass because they "enter[ed] land in the possession of [Linebaugh], or cause[d] a thing or a third person to do so." *See Purkey*, 2012 UT App 241, ¶ 17 (quotation simplified).

¶40 Because the Gibsons and Negrette trespassed on Linebaugh's property, Linebaugh is entitled to damages. We must remand for the calculation of compensatory or nominal damages as well as possible punitive damages because these are factual determinations more appropriately left to the trial court.[19] For compensatory damages, the court must determine "the value of the property before and after the trespass," *Pitts*, 589 P.2d at 769, in addition to "any personal or property injury that resulted from [that trespass]," *Walker Drug*, 972 P.2d at 1244. In the event the court finds that there are "no substantial damages" as a result of the trespass, then it shall grant nominal damages to Linebaugh. *See Henderson*, 757 P.2d at 471.

¶41 In regard to punitive damages, if Linebaugh can establish that the Gibsons or Negrette committed the trespass with a "complete disregard of [her] legally protected interest in the exclusive possession of [her] land," Restatement (Second) of Torts § 613 cmt. e, and exhibited a "knowing and reckless

---

19. In light of the fact that Linebaugh has changed her mind about the cement wall and indicated at trial that she now wishes the wall to remain, given the time and resources it will take to resolve the damages issues evidentiarily, and given that our opinion has significantly reduced the scope of the parties' dispute, it would surely seem appropriate for counsel to steer the parties to a reasonable settlement of the trespass damages to which Linebaugh is entitled.

indifference and disregard toward [her] rights," *Atkin Wright & Miles*, 709 P.2d at 337, then the court shall also grant her punitive damages.

### III. IIED

¶42   Linebaugh argues that the trial court erred in dismissing her claim for IIED because it determined that her emotional distress was not sufficiently severe to support the claim. "In Utah, a claim for IIED is actionable if: (i) the defendant's conduct is outrageous and intolerable; (ii) the defendant intends to cause emotional distress; (iii) the plaintiff suffers severe emotional distress; and (iv) the defendant's conduct proximately causes the plaintiff's emotional distress." *Wilson v. Sanders*, 2019 UT App 126, ¶ 18, 447 P.3d 1240 (quotation simplified).

¶43   "[G]eneral pain and suffering . . . , standing alone, are not sufficient to support a claim for [IIED]." *Schuurman v. Shingleton*, 2001 UT 52, ¶ 25, 26 P.3d 227. The emotional distress a plaintiff experiences must be "so severe that no reasonable [person] could be expected to endure it," which "includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." *In re Estate of Grimm*, 784 P.2d 1238, 1246 (Utah Ct. App. 1989) (quotation simplified).

¶44   Assuming, without deciding, that Appellees' conduct was outrageous and intolerable, we nevertheless affirm the trial court's grant of summary judgment in favor of Appellees because Linebaugh presented insufficient evidence, as a matter of law, to establish that she suffered severe emotional distress. Insofar as the court premised its summary judgment decision solely on the fact that Linebaugh did not obtain additional medical care and that the emotional distress did not interfere with her work, the court erred because those are not the benchmarks for the IIED tort in Utah. Even so, the totality of the

evidence Linebaugh presented, coupled with her admissions, is insufficient to establish the severe emotional distress element of IIED, and thus it is insufficient to establish a prima facie case.

¶45    Although Linebaugh correctly asserts that evidence of "medical treatment and/or interference with work [is not] required to prove 'severe' emotional distress," she was still required to present some evidence to show she suffered severe emotional distress in light of her admissions suggesting she did not. *Cf. Wilson*, 2019 UT App 126, ¶ 21 (holding that evidence presented by the plaintiff that he "was unable to perform his job safely, and was sent home from work; he was hospitalized and needed multiple therapy sessions; and his coworkers and close friends observed that he had become increasingly depressed and suicidal" was enough to support the plaintiff's claim that he suffered severe emotional distress).

¶46    Here, Linebaugh did not provide evidence of her severe emotional distress beyond her own testimony, which normally would be sufficient to defeat a summary judgment motion. But because the facts to which she stipulated substantially undercut her testimony, her claim could not withstand summary judgment. Specifically, although she continued to visit her mental health providers for pre-existing and ongoing depression and anxiety issues, she never mentioned her claimed severe emotional distress to them; her medical treatments and medications did not change after the alleged conduct by Appellees; and she suffered no adverse effects in her employment. These admissions collectively color the other aspects of her testimony and confirm, as a matter of law, that Linebaugh would not be able to make out a prima facie case and thus was not entitled to a trial on her IIED claim.

## IV. Attorney Fees

¶47    In their cross-appeal, Appellees assert that the trial court erred in declining to grant their request under Utah Code section

78B-5-825(1) for attorney fees and costs.[20] Specifically, Appellees argue that Linebaugh's causes of action for boundary by acquiescence, trespass, boundary by estoppel, IIED, and assault were all "frivolous, of very little weight, and simply had no basis in law and/or fact" and were "without merit" and asserted in bad faith.

¶48    The Utah Code provides that "the court shall award reasonable attorney fees to a prevailing party if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith." Utah Code Ann. § 78B-5-825(1) (LexisNexis 2018). "A claim is without merit if it is frivolous, is of little weight or importance having no basis in law or fact, or clearly lacks a legal basis for recovery." *Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶ 30, 61 P.3d 1009 (quotation simplified). "A party's good faith may be established by proof of an honest belief in the propriety of the activities in

---

20. Additionally, both sides seek an award of attorney fees incurred on appeal. Quoting *Utah Telecommunication Open Infrastructure Agency v. Hogan*, 2013 UT App 8, 294 P.3d 645, Appellees assert that "[e]ven where a party was not awarded attorney fees below, they may still be entitled to recover fees on appeal, '[i]f, on remand, the trial court determines that [party] is entitled to attorney fees [in which event] the trial court should also determine' and award the fees reasonably incurred on appeal as well." *See id.* ¶ 24. Because we decline to remand to the trial court with instructions to award Appellees their attorney fees incurred in the action below, we also decline to award them attorney fees on appeal. They have not "received attorney fees below" and have not "prevail[ed] on appeal." *Fadel v. Deseret First Credit Union*, 2017 UT App 165, ¶ 38, 405 P.3d 807 (quotation simplified). We also decline to award Linebaugh any fees on appeal and leave both parties to cover their own costs and expenses.

question; a lack of intent to take unconscionable advantage of others; and a lack of intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others." *Rocky Ford Irrigation Co. v. Kents Lake Reservoir Co.*, 2019 UT 31, ¶ 68 (quotation simplified).

A.    Boundary by Acquiescence and Trespass

¶49    As we have held above, *supra* ¶¶ 24–35, the trial court erred in determining that Linebaugh's claim for boundary by acquiescence was without merit. Her claim was in fact a classic boundary by acquiescence case and was properly brought before the court for resolution. Additionally, because Linebaugh's boundary by acquiescence claim was legally correct, the boundary of her property actually extended all the way to the v-mesh fence. Thus, the cement wall that the Gibsons built, along with all of the Gibsons' and Negrette's related actions that took place north of the old fence line, such as moving Linebaugh's shrubbery and cutting her lilac bush, constituted a trespass. Both claims were therefore meritorious because they had a clear foundation in law and fact that provided Linebaugh a "legal basis for recovery." *Cannon*, 2002 UT 99, ¶ 30, (quotation simplified). Obviously, then, Appellees are not entitled to attorney fees on these issues. *See Utah Telecomm. Open Infrastructure Agency v. Hogan*, 2013 UT App 8, ¶ 18, 294 P.3d 645 ("Because . . . [the plaintiff's] action had merit, we need not consider whether the action was brought in bad faith.").

B.    Boundary by Estoppel, IIED, and Assault

¶50    Appellees further assert that Linebaugh "had actual knowledge all along, including even before filing her complaint, that there was no factual basis for any of her claims." They also assert that Linebaugh's "intent was to take unconscionable advantage of [them]." Assuming, without deciding, that Linebaugh's remaining claims were without merit, we nonetheless decline to award Appellees attorney fees because

they have failed to show that the trial court's finding that Linebaugh did not bring them in bad faith was clearly erroneous. The court found that although "there clearly appears to be a questionable course of action by [Linebaugh] . . . in bringing the claims based upon the apparent lack of facts to support some of the claims, in particular the claim for [IIED] and civil assault, the Court does not find bad faith, but rather lack of judgment."

¶51 The only facts that Appellees cite in support of their claims for attorney fees below is that Linebaugh "argued for two and a half years for removal of the cement wall . . . only to admit at trial that she [did] not want it removed," that she recorded a lis pendens against the Gibson Property, that she failed to prosecute the case for "nine months after the summary judgment ruling," that "[s]he provided video evidence of what she claimed evidenced 'bullying' behavior . . . which patently [it] does not," and that "[s]he admits the only effect of the *de minimus* trespasses claims is a guesstimate of $312." Appellees then ask us to infer from these facts that Linebaugh "could not have had any honest belief in the propriety of her claims" and that she intended "to take unconscionable advantage of [them]." But this evidence does not establish that the court's "finding is without adequate evidentiary support" and therefore clearly erroneous. *Hale v. Big H Constr., Inc.*, 2012 UT App 283, ¶ 9, 288 P.3d 1046 (quotation simplified). *See Widdison v. Kirkham*, 2018 UT App 205, ¶ 9, 437 P.3d 555 ("Although failing to marshal the evidence is no longer considered a technical deficiency, an appellant failing to marshal all relevant evidence presented at trial which tends to support the findings and demonstrate why the findings are clearly erroneous will almost certainly fail to carry their burden of persuasion on appeal.") (quotation simplified).

¶52 As to Linebaugh's delay in prosecuting her claims, there could be many reasons why a party fails to move her claims forward, apart from a belief in their impropriety. Although we encourage parties to expeditiously move their claims forward, a

failure to do so is not definitive proof of bad faith. As to Linebaugh's other actions, they do not seem so egregious as to indicate bad faith but rather legal strategy or difference in interpretation of facts that, while Appellees take exception, might nonetheless be within the bounds of propriety.

¶53     Because Appellees cannot show that the trial court clearly erred in finding that Linebaugh did not proceed in bad faith, and because the trial court is afforded "a substantial measure of discretion" regarding the "fact-intensive questions about the losing party's subjective intent," we decline to disturb its ruling on these issues. *See Rocky Ford Irrigation*, 2019 UT 31, ¶ 68 (quotation simplified).

CONCLUSION

¶54     We reverse the trial court's ruling that Linebaugh failed to establish all the elements of boundary by acquiescence as to the Gibsons and their predecessors in interest. Accordingly, we also reverse the court's ruling that the Gibsons and Negrette did not trespass on Linebaugh's property. We remand to the trial court for a determination of damages as a result of the trespass. We do, however, affirm the trial court's grant of summary judgment in favor of Appellees on Linebaugh's IIED claim because Linebaugh could not, as a matter of law, establish a prima facie case entitling her to a trial on the claim. We also affirm the trial court's denial of attorney fees to Appellees and further decline to sanction either party or award attorney fees on appeal.

_____

APPENDIX

