2022 UT App 64

## THE UTAH COURT OF APPEALS

RAINER HUCK,
Appellant,
*v.*
KEN'S HOUSE LLC,
Appellee.

Opinion
No. 20210122-CA
Filed May 12, 2022

Third District Court, West Jordan Department
The Honorable Kristine Johnson
No. 180901341

W. Matthew Schiffgen, Attorney for Appellant

Eric P. Lee and Matthew J. Pugh,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
JILL M. POHLMAN and RYAN D. TENNEY concurred.

HARRIS, Judge:

¶1      This case involves a dispute between neighbors over
ownership of a narrow strip of land along the border between
their respective properties. Ken's House LLC (Ken's House) is the
record owner of the strip of land; Rainer Huck claims to have
acquired the strip through operation of the legal doctrine known
as boundary by acquiescence. After a bench trial, the trial court
sided with Ken's House and rejected Huck's claims of quiet title
and trespass. Huck now appeals, and we affirm.

BACKGROUND[1]

¶2      In April 2012, Huck bought a parcel of real property (the Huck Property) located on one of the "avenues" in the Avenues neighborhood of Salt Lake City. On the parcel was an existing building containing several apartments. From approximately 1972 to 2012, the Huck Property was controlled—through various business entities—by one family. When Huck's predecessors in interest acquired the Huck Property, a portion of the property's western boundary was marked by a fence—described as a "pig-wire fence"—running in a north-south direction. The fence was located approximately nine feet to the west of the apartment building. The wire fence did not run the entire length of the property, however; the southwestern corner of the Huck Property was covered in overgrown trees and brush, and no fence existed in this area. Over the years, the fence fell into a state of disrepair, with its wire being described as "trampled down" to the point where there remained only mere "remnants" of a fence.

¶3      The Huck Property sits next to a corner lot, and the property's western boundary abuts three separate parcels that front one of the perpendicular "streets" in the Avenues neighborhood. In 2016, Ken's House acquired the corner lot (the Ken's House Property), which abuts the southwestern portion of the Huck Property. Shortly after acquiring the property, Ken's House set about making renovations, including construction of a detached two-car garage.

¶4      As part of those renovations, Ken's House commissioned a survey, which indicated that the actual boundary between the

---

1. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard and only present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *Linebaugh v. Gibson*, 2020 UT App 108, n.5, 471 P.3d 835 (quotation simplified).

Huck Property and its neighbors to the west was approximately two-and-a-half feet farther east than where the fence remnants were located. Part of the new garage was to be built within the two-and-a-half-foot wide strip of land—along the Ken's House–Huck property boundary—located between the surveyed property line and the line indicated by the fence remnants (the Disputed Strip). Prior to beginning construction of the garage, Ken's House received permission from city planners for the garage to be built within seven-and-a-half feet of the apartment building on the Huck Property, which was an exception to the city's otherwise-applicable ten-foot setback requirement. As part of the approval process, a public meeting was held to discuss, among other things, the proposed setback variance, and notice of that meeting was sent to residents of the neighborhood. Huck did not attend this meeting, and he did not lodge any objection—on any basis, whether oral or written—to Ken's House receiving a variance to the setback requirement, including any objection on the basis that he owned the Disputed Strip.[2] After receiving approval for the variance, Ken's House completed construction of the garage, in the location it anticipated, near the end of 2018.

¶5    Huck subsequently sued Ken's House, seeking to quiet title, in his favor, to the Disputed Strip through operation of boundary by acquiescence; he also asserted that the contractors building the garage had trespassed on his land during construction. The case proceeded to a two-day bench trial.

_____

2. At trial, Huck testified that, despite being on the mailing list for the setback variance meeting, he never received notice of the meeting. Huck further asserted that if he had received notice of the meeting, he would have attended and would have objected to the variance. In its findings of fact, the trial court acknowledged Huck's claim that he did not receive notice of the meeting, but it nonetheless found "persuasive" certain trial testimony to the effect "that written notice was placed on [Huck's] property." Huck does not challenge this finding of fact on appeal.

¶6    At trial, Huck called various witnesses, including an individual (Property Manager) who had helped manage and maintain the apartment building prior to (and, in a limited capacity, after) Huck's purchase of the Huck Property. Property Manager testified that, when he first began working on the Huck Property in 1972, the wire fence was already in place, and he offered his belief that the land east of the fence, including the Disputed Strip, was part of the Huck Property. Property Manager also testified that, although the fence had certainly been "trampled down" over the years, Huck's predecessors had never attempted to remove the fence, and that some "T-posts" from the fence had remained in place until Ken's House removed them during construction of the garage. Property Manager testified that he had used the area west of the apartment complex—but not necessarily the Disputed Strip—for various maintenance-related tasks, including installing air conditioning units, repairing electrical conduits, and trimming the weeds that grew in that area. There was some discussion of Property Manager storing ladders near the old fence, but he ultimately acknowledged that those items were actually stored well to the north of the Ken's House Property, and therefore not within the Disputed Strip. Property Manager testified of no other use of the Disputed Strip.

¶7    Huck also called a member of the family (Predecessor) that controlled the Huck Property prior to Huck's acquisition. Predecessor testified that, during the times she visited the Huck Property (approximately four times a year), she remembered seeing "remnants of fencing" along the western portion of the property, and that although the fence was "inline" and obviously there, it had been trampled and beat down toward the ground and was in a state of disrepair. Predecessor additionally testified that the area west of the apartment complex never had any sort of "manicured lawn" or sprinkler lines.

¶8    Huck himself also took the stand, testifying that when he bought the Huck Property in 2012, the wire fence was intact, and that he understood that fence to represent the boundary between

the Huck Property and the Ken's House Property. Huck also testified that his tenants sometimes used the area west of the apartment building to walk their pets, and that he used the area—but not necessarily the Disputed Strip—to access the side of the apartment building for maintenance-related tasks. Huck acknowledged, however, that "the main use" of the area west of the apartment building was for safety and maintenance and to comply with the city's ten-foot setback requirement.

¶9     Ken's House then called various witnesses, including the contractor (Contractor) who had been in charge of building the garage. Contractor testified that, when he first began construction of the garage, he did not consider the remnants of the fence to mark the boundary between the Huck Property and the Ken's House Property. Contractor also testified that, during the construction of the garage, he and his team "absolutely tried to limit any use of" the Huck Property and that the equipment used in the construction would have been placed only on the Ken's House Property. When asked if the machinery used during construction of the garage ever had to operate on the Huck Property, Contractor responded, "Absolutely not."

¶10     After considering the evidence presented, as well as written closing arguments submitted by the parties, the trial court issued a written ruling, concluding that "Huck ha[d] failed to meet the first three elements of a boundary by acquiescence."[3] Regarding the "occupation" element, the court found that "there was not clear and convincing evidence that the entire boundary area was . . . occupied" because, "[w]hile there was some testimony regarding accessing the building for maintenance, accessing window air conditioners, etc., it was not clearly established that the disputed land . . . was utilized." The court also concluded that "there was no clear evidence that any such use was sufficient to provide notice to the property owners on the west."

---

3. *See infra* ¶ 12 (listing the required elements of boundary by acquiescence under Utah law).

As for Huck's trespass claim, the court found that "[a]bsent a finding that [Huck] own[ed] the disputed land, the [trespass] claim [could not] proceed." The court accordingly entered judgment in favor of Ken's House.

ISSUES AND STANDARDS OF REVIEW

¶11   Huck now appeals, challenging the trial court's factual findings and legal conclusions in two respects. First, he asserts that the court erred in determining that Huck failed to prove the first three elements of boundary by acquiescence. Second, he asserts that the court erred in determining that he failed to prove trespass. "We will not reverse the findings of fact of a trial court sitting without a jury unless they are clearly erroneous." *RHN Corp. v. Veibell*, 2004 UT 60, ¶ 22, 96 P.3d 935 (quotation simplified). "To qualify as clearly erroneous a trial court's findings must be either against the clear weight of the evidence or must induce a definite and firm conviction that a mistake has been made." *Jacob v. Bate*, 2015 UT App 206, ¶ 13, 358 P.3d 346 (quotation simplified). "But a finding is not clearly erroneous if, viewing the evidence in the light most favorable to the trial court's findings, the evidence is legally sufficient to support the finding." *Id.* And we review the trial court's conclusions of law "for correctness, according the trial court no particular deference." *RHN Corp.*, 2004 UT 60, ¶ 22 (quotation simplified).

ANALYSIS

I

¶12   Huck first contends that the trial court erred by determining that he had not satisfied the first three elements of boundary by acquiescence. To prove boundary by acquiescence, a claimant must demonstrate the following four elements:

> (1) a visible line marked by monuments, fences, buildings, or natural features treated as a boundary; (2) the claimant's occupation of his or her property up to the visible line such that it would give a reasonable landowner notice that the claimant is using the line as a boundary; (3) mutual acquiescence in the line as a boundary by adjoining landowners; (4) for a period of at least 20 years.

*Lundahl Farms LLC v. Nielsen*, 2021 UT App 146, ¶ 42, 504 P.3d 735 (quotation simplified). Boundary by acquiescence is a critical part of our property law; it "fills an important gap in the law left unaddressed by other doctrines." *Staker v. Ainsworth*, 785 P.2d 417, 423 (Utah 1990). But because boundary by acquiescence, where applicable, operates to alter recorded property lines, the doctrine "has always been restrictively applied in Utah." *See id.* One important restriction on the doctrine is that, to succeed on a boundary by acquiescence claim, "a claimant must prove each element by clear and convincing evidence." *Lundahl Farms*, 2021 UT App 146, ¶ 42 (quotation simplified). Although we recognize that the elements of boundary by acquiescence are, to some degree, interdependent, in this case we focus our analysis on the second element. In our view, the court did not err in determining that Huck failed to meet his burden of showing "occupation."

¶13 To satisfy the second element of boundary by acquiescence, Huck was required to demonstrate, by clear and convincing evidence, that he (or his predecessors in interest) occupied the Disputed Strip in such a way as to give Ken's House (or its predecessors) notice that Huck claimed ownership of it. *See Anderson v. Fautin*, 2016 UT 22, ¶ 26, 379 P.3d 1186 (stating that "the occupation element of boundary by acquiescence corresponds with the 'actual, open and notorious' requirements of adverse possession," meaning that a claimant must "occupy his or her property up to a visible line in such a manner as to place the nonclaimant on notice that he or she claims the property so

occupied" (quotation simplified)); *see also Dean v. Kang Sik Park*, 2012 UT App 349, ¶ 29, 293 P.3d 388 (explaining that, when analyzing the occupation element, "courts should consider whether a particular occupation up to a visible line would place a reasonable party on notice that the given line was being treated as the boundary between the properties" (quotation simplified)). This element can be satisfied, for example, "where land up to the visible, purported boundary line is farmed, occupied by homes or other structures, improved, irrigated, used to raise livestock, or put to similar use." *Bahr v. Imus*, 2011 UT 19, ¶ 36, 250 P.3d 56.

¶14 In this case, Huck did not present clear and convincing evidence that he or his predecessors in interest occupied the Disputed Strip in such a way as to give notice that they claimed ownership of it. Indeed, the evidence presented at trial established that the area was, in part, covered with bushes and weeds, and that Huck used it only for "safety" and to comply with the city's ten-foot setback requirement. Although some testimony at trial indicated that other portions of the side yard west of the apartment building were sometimes used to walk pets or to access the building for various maintenance-related tasks, that testimony failed to establish any noticeable use of the Disputed Strip (as opposed to other portions of the nine-foot side yard). Moreover, while Property Manager testified that he occasionally trimmed weeds that were growing in the area west of the apartment building, Huck presented no evidence regarding how often this trimming took place or how much of it took place in the Disputed Strip itself as opposed to the side yard generally. Even Huck's own attorney, in arguing against a mid-trial motion made by Ken's House, acknowledged—after Huck's evidence had all come in—that "there was very little uses for that area simply by the nature of its location and especially its proximation to the other buildings," and maintained only that Huck and his predecessors had used the Disputed Strip to comply with the ten-foot setback requirement.

¶15　But even assuming, without deciding, that this sort of passive use could conceivably be sufficient to satisfy the occupation element of boundary by acquiescence, Huck presented no evidence that he ever notified any of his neighbors of his belief that he was occupying the Disputed Strip for purposes of satisfying the setback requirement. Under the facts presented here, Huck simply did not present clear and convincing evidence that he occupied the Disputed Strip in such a way as to place Ken's House "on notice that the given line was being treated as the boundary between the properties." *See Dean*, 2012 UT App 349, ¶ 29 (quotation simplified). Accordingly, Huck's boundary by acquiescence claim founders on the second element, and the trial court therefore did not err in dismissing that claim.

II

¶16　Huck next claims that the trial court erred in concluding that Ken's House did not trespass on his property during construction of the garage. Huck's claims in this regard are twofold. First, Huck contends that he owns the Disputed Strip by operation of the doctrine of boundary by acquiescence, and he points out that Ken's House's garage is built, in part, on the Disputed Strip. Because we have determined that the court did not err in dismissing Huck's boundary by acquiescence claim, this first part of Huck's trespass claim necessarily fails as well.

¶17　Second, Huck contends that, even if Ken's House owns the Disputed Strip and even if the garage is entirely built on Ken's House land, Ken's House contractors trespassed onto Huck's property while constructing the garage. To demonstrate trespass, Huck needed to introduce evidence that the contractors intentionally entered his land without permission. *See Linebaugh v. Gibson*, 2020 UT App 108, ¶ 36, 471 P.3d 835 ("A person is liable for trespass when, without permission, he intentionally enters land in the possession of another, or causes a thing or a third person to do so." (quotation simplified)). But Huck presented insufficient evidence of any such trespass at trial. Contractor

testified that he and his team "absolutely tried to limit any use of" the Huck Property during construction and that it "absolutely [did] not" operate any machinery on the Huck side of the property line. To rebut this testimony, Huck points to a single photograph showing that some fencing materials, including a post, that were previously located on the Disputed Strip had been removed and laid down on the Huck Property, just over the property line. But the fact that these particular fencing materials—which were claimed by Huck as his property—were set down just over the Huck side of the line does not, standing alone, prove trespass; it could merely connote an effort by the contractors, while standing on the Ken's House side of the property line, to give fencing components claimed by Huck to Huck. Indeed, Contractor did not acknowledge that he ever set foot on the Huck side of the property line; when asked about the photograph, he stated merely that he had "removed and set to the side" a post that had been located in the Disputed Strip. At a minimum, we cannot say that the trial court erred in concluding that this photograph, standing alone, did not constitute sufficient evidence of trespass.

CONCLUSION

¶18   Huck failed to present clear and convincing evidence that he (or his predecessors) occupied the Disputed Strip in a way that would have put Ken's House (or its predecessors) on notice that Huck claimed ownership of it. On this basis, we affirm the trial court's judgment in favor of Ken's House on Huck's boundary by acquiescence claim. And for the reasons just stated, we also affirm the trial court's judgment in favor of Ken's House on Huck's trespass claim.

¶19   Affirmed.

_____